818 So.2d 1255 (2002)
In the Matter of the Estate of Zula M. DOWDY: J.T. Malone, Donna B. Warren, Jane Bolin and Betty Kline, Appellants,
v.
Tommy SMITH, Appellee.
No. 2001-CA-00562-COA.
Court of Appeals of Mississippi.
June 11, 2002.
*1256 James G. McLemore, Jr., Carthage, attorneys for appellants.
Jeffrey T. Webb, Carthage, attorneys for appellee.
Before SOUTHWICK, P.J., THOMAS, and MYERS, JJ.
SOUTHWICK, P.J., for the court.
¶ 1. Presented here are issues regarding the possible revocation of a last will and testament, the mental capacity of the testator when executing a power of attorney, and the possible undue influence of a family member over the testator. The chancellor set aside the power of attorney and some transfers effected under it, and then upheld the validity of the will over the claim of revocation. On appeal it is argued that the chancellor erred in these findings. We disagree and affirm.

FACTS
¶ 2. The testatrix, Zula Dowdy, died on January 3, 2000, at the age of eighty-nine. She was survived by her siblings, J.T. Malone and Winona Smith. In addition, Dowdy was survived by ten nieces and nephews. Among them were Tommy and Dorothy Smith. The estimated value of Dowdy's estate was $263,697.83.
¶ 3. Dowdy made several wills during her lifetime. Each of the wills left the bulk of her estate to her son, Elgie Smith, and to her nephew, Tommy Smith. She apparently considered the latter as almost her second child. Dowdy executed a will on June 21, 1988, in which she granted her son, Elgie Smith, a life estate in her property. The remainder would pass to Tommy Smith. In 1994, Dowdy executed another will, this time leaving her entire estate to Elgie. The will had a clause that if Elgie Smith predeceased Dowdy, the entire estate would go to Tommy Smith. Elgie Smith died in 1997. Subsequently Dowdy entered into an agreement with Tommy and Dorothy Smith, who were separated at the time, that if they would reunite as husband and wife and take care of her, she would leave her estate to them. This agreement was followed by the execution of a new will on August 4, 1997, in *1257 which Dowdy left her entire estate to Tommy and Dorothy Smith.
¶ 4. J.T. Malone was Dowdy's brother. He contends that before Dowdy died, she destroyed her will and that it was her desire to die intestate. Upon Dowdy's death her original will of August 4, 1997, could not be located. What was presented for probate was an executed copy that was in the possession of Tommy Smith. No one testified to having witnessed the destruction of the will, nor was anyone aware of the date that a revocation might have taken place. There was testimony that Dowdy kept her will in a safety deposit box at the Carthage Bank where it remained until Dowdy removed it under Malone's direction. At the Carthage Bank, Dowdy had certificates of deposit and a checking account. The certificates of deposit were payable at her death to Tommy Smith; her checking account was a joint account with Dorothy Smith. Dowdy had made prior arrangements so that both the certificates of deposit and the money in the checking account would go to Tommy and Dorothy Smith upon her death.
¶ 5. On October 19, 1998, Malone and his wife, Oneida, admitted Dowdy to the Senior Life Care in Carthage, where she was diagnosed as having dementia and as suffering from major depression. On October 30, Malone accompanied his attorney to the nursing home and presented a power of attorney to Dowdy, which she signed in favor of Malone. Medical testimony by Dowdy's attending physician established that due to the nature of her disorder coupled with the medication being used as part of her treatment plan, that it was highly unlikely that she was aware of the legal consequences of a power of attorney. Winona Smith, Dowdy's sister, testified that no attempts were made by either Malone or his attorney to explain the nature of the document.
¶ 6. Shortly after the power of attorney was signed, Malone went to the Carthage Bank and under the authority of the power of attorney had the "payable at death to Tommy Smith" provisions removed from the certificates of deposit. Malone also removed Dorothy Smith's name from Dowdy's checking account. At trial Malone testified these actions were necessary to protect Dowdy's estate from the government, and that the changes on the certificate of deposit and checking account were performed so that Malone would be able to care for Dowdy financially. Malone admitted at trial and during his deposition that Dowdy never expressly authorized any of the above acts.
¶ 7. Malone and another relative, Raymond Tucker, filed a petition for letters of administration two weeks after Dowdy's death in January 2000. They alleged that Dowdy died leaving no last will and testament. Tommy Smith filed a separate petition, attaching a copy of Dowdy's 1997 last will and testament. The two actions were consolidated. Tucker and Smith were named temporary co-administrators. The issues regarding the continuing effectiveness of the will, the actions by Malone to change the survivorship rights on Carthage Bank accounts and certificates, and Dowdy's mental capacity when executing the power of attorney were all raised in these proceedings.
¶ 8. The chancellor made a number of alternative findings, all supporting the ultimate decision. He found that Dowdy lacked the mental capacity to execute a power of attorney. The power of attorney was also found to be void because of Malone's undue influence. The chancellor determined that even had Dowdy been mentally competent, equity demanded that Tommy Smith receive the certificates of deposit because Malone's action benefitted him, not Dowdy. Finally, Dowdy's will was found to be irrevocable because it was *1258 part of an agreement with Tommy and Dorothy Smith; moreover, insufficient proof of physical revocation was presented.

DISCUSSION

I. Sufficiency of the Evidence on Revocation.
¶ 9. Malone attempted to convince the chancellor that Dowdy burned her will. There was no direct evidence of that, but there were some suggestions that she might have. The principal basis on which to find intentional destruction is that the original will could not be located, coupled with testimony that Dowdy made statements to some family members of her intent to destroy the will.
¶ 10. A testator's intent to revoke a will must be shown to be clear and unequivocal. Matter of Estate of Leggett, 584 So.2d 400, 402-3 (Miss.1991). Malone never established that Dowdy actually burned her will. However, "a rebuttable presumption of destruction of a will with intent to revoke arises when the evidence shows (a) the testator made a will, (b) which was last shown to have been in its maker's possession, but (c) it was not found after death despite a reasonably diligent search." Id. at 403.
¶ 11. This presumption was established by evidence. It is undisputed that Dowdy had the will in her possession prior to her death; the original has yet to be found. However, this presumption can be defeated with slight evidence when it can be shown that contestants of the will had access to it. Matter of Estate of Tallant v. Tallant, 644 So.2d 1189, 1195 (Miss.1994). There was testimony that Malone took Dowdy to the safety deposit box in which her will was kept. Further testimony revealed that after Dowdy retrieved her will from the safety deposit box, that she began keeping the will in her home. Shortly after Malone obtained the power of attorney from Dowdy, he had all the locks to her home changed. That gave him complete access to her home. We find that these facts are more than slight evidence to rebut the presumption that Dowdy intended to revoke her will.
¶ 12. We start by recognizing that there were three wills entered into evidence in this trial. From all accounts, Dowdy was meticulous about the handling of her affairs. The effort and expense to prepare three wills suggests that she did not want her estate to be distributed by the dictates of the statute on intestacy. The absence of evidence that she actually did destroy her will undercuts the presumption arising from the failure to locate the original. Dowdy was elderly and needed constant supervision. Malone may not have taken Dowdy to retrieve her will from her safety deposit box until August 1998, which makes a suggestion from one witness that she had destroyed the will the previous month a physical impossibility.
¶ 13. We find no error in the chancellor's finding that the will was not intentionally revoked by its physical destruction.

II. Contractual Obligation.
¶ 14. The chancellor also found that the will was irrevocable. This determination was based on an oral agreement between Dowdy on the one hand and Tommy and Dorothy Smith on the other.
¶ 15. We need not examine the evidence or legal principles on this point. Our upholding the chancellor's decision that the will was never physically revoked makes moot this alternative ground for enforcing the copy of the will.

III. Mental Capacity.
¶ 16. The chancellor also found that Dowdy was not mentally competent at the time that she executed the power of attorney to Malone. We found no Mississippi precedents that address the standard of mental competence required to execute *1259 a power of attorney. We find that a fair analogy is the standard for determining whether a testator has the capacity to execute a will. Both a general power of attorney and a last will and testament require an appreciation of the nature and extent of a grantor's estate and the effects of a potential distribution.
¶ 17. A prima facie case for the validity of a last will and testament is presented when the will properly executed is offered for probate. Harris v. Sellers, 446 So.2d 1012, 1014 (Miss.1984). Similarly, there was a presumption of regularity attaching to the properly executed power of attorney presented by Malone.
¶ 18. To overcome this evidence, Tommy Smith presented evidence regarding Dowdy's competence at the time of execution of the power of attorney.
[T]he test of one's capacity to execute a will is the ability of the testator at the time to understand and appreciate the nature of his act, the natural objects or persons to receive his bounty, and their relation to him, and is capable of determining what disposition he desires to make of his property.
Matter of Estate of Edwards, 520 So.2d 1370, 1372 (Miss.1988).
¶ 19. Dowdy's psychiatrist, George Ladner, testified that at the time that Dowdy signed the power of attorney she suffered from both dementia and depression. Dr. Ladner found that it was highly unlikely that she understood the consequences of such a document. Dr. Ladner had examined Dowdy one day before she signed the power of attorney. Dowdy was confused and heavily medicated for her dementia, unresponsive to questions, and thought that she was speaking with and calling for dead relatives. Several days after Dowdy signed the power of attorney Dr. Ladner again examined Dowdy and observed that she was still exhibiting the same symptoms.
¶ 20. Another nursing home employee testified that Dowdy was alert but confused on the day that she signed the power of attorney. Dowdy's sister, Winona Smith, was present at the time the power of attorney was signed. She testified that no one explained to Dowdy that she was signing a power of attorney or the consequences associated with the document.
¶ 21. Other witnesses stated that they would have frequent conversations with Dowdy. Most of the time she appeared capable of conversing in fairly normal fashion. Capacity is assessed at the moment of execution of a legal instrument, but the contestants may carry their burden by establishing that the "grantor was permanently insane up to and beyond that moment in time." Mullins v. Ratcliff, 515 So.2d 1183, 1190 (Miss.1987).
¶ 22. Malone relies on In the Matter of the Estate of Edwards, 520 So.2d 1370 (Miss.1988). There the testator had been diagnosed with a disease that was progressive in nature. However, at the time that he executed his will, the decedent chose his attorney, dictated the terms of his will and made decisions to disregard portions of his attorney's advice. The evidence in Edwards of mental capacity was accepted. As to Dowdy, the chancellor had much stronger evidence from both professional and lay witnesses that the necessary mental capacity for the power of attorney did not exist.
¶ 23. Since we uphold the finding that the power of attorney was executed by Dowdy when she did not have the competence to do so, the changes made to bank account and certificate of deposit ownerships that were made under the authority of that instrument must be set aside.

IV. Undue Influence.
¶ 24. As another one of the alternative grounds for ordering relief in the case, the *1260 chancellor also found that the power of attorney in favor of Malone was obtained through undue influence. Here, too, we find no reason to explore this alternative ground factually or legally in any detail. Since Dowdy did not have the mental capacity to execute it, whether Malone simultaneously was attempting to influence her unduly is a matter of only academic interest.
¶ 25. Any actions taken under the authority of the power of attorney are invalid. Therefore, the prior arrangements are reinstated that Dowdy had made for the disposition of her certificates of deposit and money in her checking account. The certificates of deposit and funds in Dowdy's checking account therefore pass to Tommy and Dorothy Smith.
¶ 26. THE JUDGMENT OF THE CHANCERY COURT OF LEAKE COUNTY IS AFFIRMED. ALL COSTS ARE ASSESSED TO THE APPELANTS.
McMILLIN, C.J., KING, P.J., BRIDGES, THOMAS, LEE, MYERS, CHANDLER AND BRANTLEY, JJ., CONCUR. IRVING, J., NOT PARTICIPATING.