# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-01447-COA

IN THE MATTER OF THE ESTATE OF                  **APPELLANTS**
RICHARD L. GARDNER, DECEASED: LINDA
GARDNER CALLINGTON, ANDREW
GARDNER AND LARRY ROSS

v.

MAE OTHA GARDNER                                     **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/21/2015 |
| TRIAL JUDGE: | HON. JON M. BARNWELL |
| COURT FROM WHICH APPEALED: | TALLAHATCHIE COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANTS: | JOSHUA A. TURNER |
| ATTORNEYS FOR APPELLEE: | WILLIAM R. SANDERS JR. DARRIN JAY WESTFAUL |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| TRIAL COURT DISPOSITION: | FOLLOWING A JURY VERDICT IN FAVOR OF THE APPELLANTS, GRANTED THE APPELLEE'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT |
| DISPOSITION: | AFFIRMED - 02/21/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, P.J., WILSON AND GREENLEE, JJ.**

**WILSON, J., FOR THE COURT:**

¶1. Richard Gardner died leaving a will that devised his entire estate to his wife, Mae Otha Gardner. An estate was opened and later declared insolvent. However, a fire destroyed a building owned by the estate, and insurance proceeds were sufficient to pay the estate's debts and leave a surplus for Mae Otha. At that point, Richard's children filed a petition to contest the will. A jury returned a verdict for the children, finding both that Richard did not

sign the will and that he lacked testamentary capacity. However, the chancellor granted Mae Otha's motion for judgment notwithstanding the verdict. On appeal, Richard's children argue that there was sufficient evidence to sustain the verdict, but we agree with the chancellor that Mae Otha was entitled to judgment as a matter of law. Therefore, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Richard was born in Indianola in 1925 and lived most of his life in Charleston, Mississippi. Richard and his first wife had three children, Linda Gardner Callington, Andrew Gardner, and Sylvia Gardner Moore. Richard had a fourth child, Larry Ross, by another woman. Richard's first wife passed away, and in February 1987 he married Mae Otha. At the time of their marriage, Richard was sixty-one years of age, and Mae Otha was forty-two. No children were born to their marriage.

¶3.     Linda testified that before Richard married Mae Otha, he told Linda that he wanted her to be the executor of his estate and that he wanted each of his children to receive a child's part. Linda testified that after Richard married Mae Otha, he stated that Mae Otha should also receive a child's part of his estate.

¶4.     Linda testified that in "the latter part of 2008" her father "started being a little sick," and in February 2009 he had a "little light stroke." Linda testified that he recovered from the stroke but became "sicker and weaker." Linda testified that Richard was taking Risperdal, Hydrocodone, and Plavix. Linda's husband, Jeff Callington, claimed that the Risperdal "would render [Richard] helpless" and unable to open his eyes or sometimes caused his hands to shake. Linda also testified that Richard had started bouncing checks, so the children

2

encouraged him to execute a power of attorney in favor of Mae Otha.

¶5.	Mae Otha testified that she and Andrew took Richard to the hospital in February 2009 because she thought he had a stroke.  However, the doctors told her that they could not find anything wrong with Richard and that, if anything, he had a "mini-stroke" that did not show up on his MRI or other tests.  Richard was released from the hospital on March 1, 2009.

¶6.	On March 2, 2009, Richard went to see attorney William Sanders of Charleston. According to Sylvia, she and Richard first went to the mayor's office because Richard had decided to withdraw from an election for city commissioner, a position he previously held for approximately twenty years.[1]  Sylvia testified that at the mayor's office, Richard "started fumbling with some . . . material that was on [a woman's] desk," and she had to tell him to stop.  Richard and Sylvia then met Mae Otha at Sanders's office.  Sylvia testified that all three of them met with Sanders, that they discussed the contents of a power of attorney, and that Richard signed the power of attorney.  Sylvia testified that she never left her father's side while at Sanders's office and that a will was never mentioned or discussed.  Sylvia testified that Richard's "mental capacity" "was okay, but he wasn't real talkative. . . . [H]e was okay at that particular time.  But he was real weak still, kinda like wasn't able to function."

¶7.	Sylvia's testimony about the visit to Sanders's office conflicted with that of everyone else present.  Mae Otha testified that Sylvia told Richard that morning that he needed to get a will and a power of attorney.  According to Mae Otha, Sylvia drove her and Richard directly to Sanders's office, and Richard withdrew from the commissioner's race on a

_____

[1] Charleston is governed by a mayor and a board of commissioners pursuant to a "special" or "private" charter.

different day. Mae Otha testified that she stayed in the waiting room, while Richard and Sylvia went into Sanders's office. She testified that at some point, someone came out and asked her "about an old will or something," so she went home to look for one, but by the time she returned to Sanders's office, they had finished preparing the power of attorney and will.[2] Mae Otha subsequently filed the power of attorney with the chancery clerk. Mae Otha testified that her husband's mental condition was fine on March 2, 2009, and that he understood what he was doing.

¶8.    Sanders testified that he knew Richard well because he had been the city attorney for many years while Richard served as a commissioner. Richard did not have an appointment on March 2, 2009, but Sanders agreed to meet with Richard and Sylvia. According to Sanders, both Richard and Sylvia wanted Sanders to prepare a power of attorney and a will for Richard. Sanders testified that he asked Sylvia to leave the room so that he could talk to Richard alone. Sanders testified that he asked Richard several questions to ensure that Richard knew where he was, who and where his family members were, and that he desired to make out a will. Sanders testified that Richard stated several times what he wanted in his will. According to Sanders, Richard stated that he had already "given most of [his] money away" to his children and other relatives, so he "want[ed] everything [he had] left to go to . . . Mae Otha." Sanders then prepared the will and power of attorney and asked for Sylvia and his secretary, Mary Roussel, to come into his office. Richard signed both documents, and Sanders and Roussel also signed both documents as witnesses.

---

[2] Linda testified that she recalled Mae Otha returning home to look for an old will.

¶9.    Roussel testified that she had known Richard for over twenty years.  She confirmed that she witnessed him sign both the will and power of attorney and that she signed as a witness.  Roussel testified that she had a "normal conversation" with Richard that day, they talked about his children, and he seemed to be fine.  Roussel also testified that Mae Otha stayed in the waiting room while Richard and Sylvia went back to see Sanders.

¶10.    Linda testified that she saw Richard on March 2, 2009, after he returned home from Sanders's office.  According to Linda, she asked to see the will because Richard had told her previously that he had written out his will and that he wanted her to review it.  Mae Otha responded, "It's at the lawyer's office."  Her father nodded in agreement and told her that she could read it later.  Apparently there was no further discussion of the will.

¶11.    Linda testified that on March 2, 2009, her father's "physical state was terrible -- mentally and physically."  According to Linda, he was too weak to get in and out of the car without physical assistance.  Linda also testified that Richard had agreed to withdraw from a political race; according to Linda, Sylvia had persuaded him to withdraw because his "mind [was] not good enough to run for" office.

¶12.    Mae Otha testified that Richard's mental condition was fine on March 2, 2009, and continuing until his death. Mae Otha testified that Richard decided to close a laundromat that he owned on or about March 12, 2009, because he was losing money on the business.

¶13.    Richard passed away in Charleston on April 20, 2009, at the age of eighty-four.  On May 11, 2009, Mae Otha filed a petition to probate the will and for letters testamentary, and in May and June 2009, notice to creditors of the estate was duly published in the *Sun-*

5

*Sentinel*, a newspaper published in Tallahatchie County.

¶14. On July 29, 2009, Mae Otha filed a motion to declare Richard's estate insolvent and to permit the sale of certain estate assets. The motion showed the estate's assets as consisting primarily of a commercial building and lot (the former laundromat); commercial washers and dryers and other fixtures found inside the building; various vacant lots in Charleston; Richard's home, in which Mae Otha continued to reside; and a riding lawnmower. Richard's debts included, among others, $44,977 plus interest owed to the Tallahatchie County Bank, which was secured by the commercial property, his home, and a vacant lot; $9,936.23 plus interest owed to the Tallahatchie County Bank and secured by the lawnmower; and several years of unpaid property taxes. The estate's motion represented that these assets could not be sold or their value estimated easily and requested permission to begin attempting to sell assets in order to pay debts. The court subsequently approved requests by the estate to sell the riding lawn mower and one vacant lot, and the proceeds of those sales were used to make partial payment to the bank and to pay some of the unpaid property taxes.

¶15. On December 28, 2009, the old laundromat was destroyed in a fire. The property was insured, and the insurer paid $237,108.27 for the loss. The insurance proceeds were used to pay the estate's remaining debts, which totaled $89,687.21. The court then granted Mae Otha's motion to close the estate and to allow her to distribute the remaining assets to herself, as the sole beneficiary of the will. The court's order, which was entered on March 9, 2010, approved attorneys' fees and expenses of $23,899.05, which left a surplus of $123,522.01 from the insurance proceeds.

¶16.    On April 15, 2011, Richard's four children filed a petition to contest and to set aside their father's will.  The children alleged that the will should be set aside because Richard lacked testamentary capacity, because Mae Otha exerted undue influence over him, and because the will was a forgery and was not duly executed.

¶17.    In March 2015, a jury trial was held on the petition.  Before submitting the case to the jury, the chancellor granted a directed verdict on the issues of undue influence and forgery.  By a 10–2 vote, the jury returned a verdict for the children.  The verdict specifically found both that Richard lacked testamentary capacity and that he did not sign the will.

¶18.    On April 7, 2015, Mae Otha filed a motion for JNOV or, in the alternative, a new trial.  On August 24, 2015, the chancellor entered an order granting Mae Otha's motion for JNOV.  The chancellor reasoned that he should not have submitted the case to the jury because the children presented no evidence that Richard lacked testamentary capacity.  The chancellor also reasoned that because he had already granted a directed verdict on the issue of forgery, the question whether Richard signed the will should not have been submitted to the jury either.  On appeal, the children argue that the verdict should be reinstated and the case remanded for further proceedings.

**DISCUSSION**

¶19.    "Our standard of review for a trial court's grant of a motion for [JNOV] is de novo." *Watts v. Radiator Specialty Co.*, 990 So. 2d 143, 150 (¶21) (Miss. 2008).  We "consider the evidence in the light most favorable to the non-movant, giving that party . . . the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Forbes v. Gen.*

*Motors Corp.*, 935 So. 2d 869, 872 (¶3) (Miss. 2006). "[I]f the facts so considered point so overwhelmingly in favor of the movant that reasonable jurors could not have arrived at a contrary verdict," then the movant is entitled to JNOV. *Id.* However, "if there is substantial evidence, that is, evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, we cannot affirm the grant of a [motion for JNOV]." *Id.*

¶20. The children argue that the chancellor erred by granting Mae Otha's motion for JNOV because there was "evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment" (*id.*) could have found that Richard lacked testamentary capacity or did not sign the will. We address these issues in turn.

## I. Testamentary Capacity

¶21. "For a will to be valid, the testator must possess testamentary capacity." *Noblin v. Burgess*, 54 So. 3d 282, 291 (¶32) (Miss. Ct. App. 2010). To have testamentary capacity, an individual must be of "sound and disposing mind." Miss. Code Ann. § 91-5-1 (Rev. 2013). "Testamentary capacity is determined based on three factors: (1) whether the testator had the ability at the time of the will to understand and appreciate the effects of his act; (2) whether the testator had the ability at the time of the will to understand the natural objects or persons to receive his bounty and their relation to him; and (3) whether the testator was capable of determining at the time of the will what disposition he desired to make of his property." *In re Estate of Laughter*, 23 So. 3d 1055, 1061 (¶20) (Miss. 2009). In addition, "[r]ecognizing that a testator may not always possess testamentary capacity, [the Supreme Court has] held

8

that he may nevertheless execute a valid will during a lucid interval." *In re Estate of Edwards*, 520 So. 2d 1370, 1373 (Miss. 1988). "The key to testamentary capacity is mental competency at the time the will is made." *Lee v. Lee*, 337 So. 2d 713, 715 (Miss. 1976).

¶22. "The burden of proving testamentary capacity is on the proponents of the will, who can present a prima facie case simply by offering into evidence the will and the record of probate." *Laughter*, 23 So. 3d at 1061 (¶18). "Once a prima facie case has been established, the burden of going forward shifts to the contestants to overcome the prima facie case." *Id.* The ultimate burden of proof remains on the proponent, who "may . . . present rebuttal proof if necessary." *Edwards*, 520 So. 2d at 1373. The Supreme "Court has held that the testimony of subscribing witnesses is entitled to greater weight than the testimony of witnesses who were not present at the time of the will's execution or did not see the testator on the day of the will's execution." *Id.* "In fact, the subscribing witnesses to a will may testify as experts on the question of testamentary capacity." *Id.*

¶23. "Furthermore, . . . opinions of lay witnesses regarding testamentary capacity [must] be supported by 'facts as a basis for the witnesses' conclusion.'" *Estate of Rutland v. Rutland*, 24 So. 3d 347, 353 (¶20) (Miss. Ct. App. 2009) (quoting *In re Estate of Briscoe*, 293 So. 2d 6, 8 (Miss. 1974)). "Overly broad or generalized testimony indicating a lack of capacity will be deemed insufficient where it is contradicted by competent evidence and is 'obviously based upon the infirmities of advancing age rather than upon any abnormal conduct indicative of mental aberration.'" *Id.* (quoting *Briscoe*, 293 So. 3d at 8).

¶24. In the present case, we conclude that the chancellor correctly granted Mae Otha's

motion for JNOV because the children failed to come forward with evidence "to overcome the prima facie case" of testamentary capacity. *Laughter*, 23 So. 3d at 1061 (¶18). As discussed above, Sylvia, who accompanied Richard to Sanders's office and claims to have been present at the power of attorney's execution, testified that Richard's "mental capacity" "was okay, but he wasn't real talkative. . . . [H]e was okay at that particular time. But he was real weak still, kinda like wasn't able to function." Linda testified, without specificity, that later in the day on March 2, 2009, Richard's "physical state was terrible -- mentally and physically." She also testified that he was too weak to get in and out of a car without assistance. However, physical weakness does not preclude one from making a will, and a bare and unexplained assertion that a testator's mental state was "terrible" does not raise a jury issue as to his mental capacity.

¶25. The children also point to Richard's decision to withdraw from a local election, they say because of concerns that his mind was not up to the task. However, Richard's agreement that he was no longer up to the task of campaigning for elected office does not amount to an admission or even evidence that he lacked the mental capacity to sign a will. Finally, the children rely on testimony from Linda and Jeff about the effects of medication on Richard. However, neither Linda nor Jeff was present when Richard executed his will, and none of those who were present testified that Richard was under the influence of medication to the extent that he appeared incapable of understanding what he was doing.

¶26. The subscribing witnesses to the will—Sanders and Roussel—had both known Richard for many years, and both testified that he was mentally alert and capable of

10

understanding what he was doing when he executed his will. Sanders further testified that Richard was clear and specific regarding his wishes. Moreover, in addition to the absence of any evidence that Richard lacked testamentary capacity, we note that the mental capacity required to execute a general power of attorney is essentially the same as the capacity required to execute a will. *See Dowdy v. Smith*, 818 So. 2d 1255, 1258-59 (¶16) (Miss. Ct. App. 2002). With Linda's encouragement, Sylvia took Richard to Sanders's office for the specific purpose of signing a general power of attorney, and Sylvia testified specifically that she believed that her father had the mental capacity to sign the power of attorney. Yet neither Sylvia nor Linda was able to explain at trial why they thought Richard had the capacity to sign the power of attorney but not the will.

¶27. In short, the children presented no evidence that Richard lacked testamentary capacity at the time he executed his will. All testimony relevant to his mental capacity on March 2, 2009, indicates that he had sufficient capacity to execute both a general power of attorney and a will. Accordingly, the chancellor's ruling granting Mae Otha's motion for JNOV was correct as it relates to the issue of testamentary capacity. *See Hayward v. Hayward*, 299 So. 2d 207, 209-11 (Miss. 1974); *Noblin*, 54 So. 3d 291-95 (¶¶34-45); *Rutland*, 24 So. 3d at 351-53 (¶¶10-22); *In re Estate of Pigg*, 877 So. 2d 406, 410-11 (¶¶12-23) (Miss. Ct. App. 2003).

## II. Richard's Signature

¶28. As discussed above, Sylvia claimed that she witnessed her father sign the power of attorney but that a will was never mentioned or discussed. When asked at trial whether the signature on the will appeared to be her father's, she testified, "It don't seem to be." When

11

asked on cross-examination whether the signature on the power of attorney was her father's, she testified, "It's not my father's -- well, this is my father's, looks like it's my father's writing." And when asked to explain the difference between the two signatures—which, to the lay eye, look the same—Sylvia testified that the signature on the will dipped ever so slightly below the signature line, whereas the signature on the power of attorney did not. Jeff and Linda also testified that the signature on the will does not appear to be Richard's, although Linda testified that it "describes" her father's signature "a little bit." No other examples of Richard's signature were offered or admitted into evidence.

¶29. In contrast, the two subscribing witnesses to the will—Sanders and Roussel—both testified unequivocally that they personally observed Richard sign the will and that the signature on the will was his.

¶30. When counsel for the parties began discussing jury instructions, counsel for the children essentially conceded that there was no evidence of "forgery" but nonetheless contended that the question whether Richard signed the will should be submitted to the jury. Counsel for Mae Otha argued that he had proven as a matter of law that the signature was Richard's and that any suggestion to the contrary was frivolous. The chancellor ultimately agreed to submit the issue to the jury without any mention of "forgery."

¶31. We agree with the chancellor's post-trial ruling that there was no evidence from which a rational juror could have found that Richard did not sign the will. Logically, if the signature on the will were not Richard's, *someone* must have forged it, and Sanders and his secretary must have been complicit in the forgery. But the children do not even argue that

12

there is any evidence of forgery. Furthermore, the testimony of Linda, Jeff, and Sylvia that the signature does not appear to be or does not look like Richard's is insufficient to create a jury issue in the face of the testimony of two subscribing witnesses that it *is* his signature. This is particularly true given that the signature on the will is virtually indistinguishable from the concededly authentic signature on the power of attorney, which was executed on the same day. *Compare Culbreath v. Johnson*, 427 So. 2d 705, 708-09 (Miss. 1983) (affirming chancellor's finding that a deed was forged based on not only lay testimony but also the "tremendous variance" between the challenged signature and admitted true samples of the grantor's signature, expert testimony, and the fact that the only purported witnesses to the deed's execution were the grantees and their minor children). Accordingly, the chancellor's ruling granting Mae Otha's motion for JNOV was also correct as it relates to the question whether Richard signed the will.

## CONCLUSION

¶32. For the foregoing reasons, there was no evidence from which a rational juror could have found that Richard lacked testamentary capacity or did not sign the will. Accordingly, we affirm the ruling of the chancery court granting Mae Otha's motion for JNOV.

¶33. **THE JUDGMENT OF THE TALLAHATCHIE COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, CARLTON, FAIR, GREENLEE AND WESTBROOKS, JJ., CONCUR. IRVING, P.J., NOT PARTICIPATING.**

13