# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-01114-COA

**IN THE MATTER OF THE ESTATE OF LINDA**         **APPELLANT**
**SMITH MYLES WILLIAMS, DECEASED:**
**LATOYA WILLIAMS**

**v.**

**EDWARD MYLES**         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/11/2024 |
| TRIAL JUDGE: | HON. DEBRA MICHELLE GILES |
| COURT FROM WHICH APPEALED: | SUNFLOWER COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | ALSEE McDANIEL |
| ATTORNEY FOR APPELLEE: | EDWARD MYLES (PRO SE) |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 04/14/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J, WEDDLE AND LASSITTER ST. PÉ, JJ.**

**WEDDLE, J., FOR THE COURT:**

¶1. This is a will contest appeal from the Chancery Court of Sunflower County. The chancellor found that Linda Smith Myles-Williams, the decedent, lacked testamentary capacity to execute her last will and testament on August 9, 2022.[1] The chancellor also found that the will was invalid because Linda had been subjected to undue influence. Linda was survived by her seven children: Dionne Yolanda Myles-Griffin, Edward D'Juan Myles, Dashun Myles, Demarcus Myles, Latoya Williams, Joshua Williams, and Cameron

---

[1] Testimony during trial revealed that there was another will, but as the chancellor pointed out in her opinion, the first will was never submitted to the court.

Williams.[2]

¶2. On appeal, Latoya argues that the court erred by (1) finding that Linda lacked testamentary capacity at the time of the execution of her will, and (2) ruling that Latoya abused her confidential relationship with Linda. Finding no error, we affirm.

**FACTS**

¶3. Linda died on October 27, 2022, at the age of seventy-two. On March 10, 2023, Latoya sought to admit for probate Linda's will executed on August 9, 2022. The will was witnessed by Betty Fowler, Linda's longtime friend, and Alsee McDaniel. Latoya was named as the executrix and was to inherit 75 percent of Linda's estate. Linda's will also divided the remainder of her estate in various percentages among four of her other children, excluding Edward and Dionne. Edward contested the validity of the will, arguing that Linda lacked testamentary capacity. Edward asserted that during the time the will was executed, Linda was disoriented, "in and out of a state of confusion," and that her judgment remained diminished from a stroke on April 30, 2022. In support of his claim, Edward submitted into evidence a typewritten letter from Linda dated prior to her stroke, medical records, and financial records.

¶4. The court admitted the letter into evidence pursuant to the Mississippi Rules of Evidence 602 and 901. The letter, dated November 23, 2018, was addressed to Edward and Dionne and seemingly represented Linda's final wishes. In her letter, Linda outlined funeral

---

[2] Linda adopted Latoya, Dashun, Demarcus, Joshua, and Cameron. Edward and Dionne were Linda's biological children.

arrangements and stated, "I am leaving all of whatever I own to [Dionne] and [Edward]." Linda referenced all her children in the letter and stated, "I have tried to help and assist all of the youth that I adopted, I have done my share."

¶5.     Edward submitted medical records showing that on the day Linda's will was executed, she was admitted to North Sunflower Medical Center and remained there until her discharge on August 12, 2022. Linda had been nauseous and vomiting since the night before, August 8, 2022. Edward testified that as a registered nurse, Linda's medical orientation the night she was admitted "stood out" to him. He pointed out that Linda's orientation was a two on a scale of one to four during her hospitalization. He added, "And when we talk about orientation, that means do I know where I am, do I know what time it is, do I know what's going on." It was noted several times in Linda's hospital records that Linda displayed moments of confusion.

¶6.     Financial records show that some time after Linda's stroke, Dionne was added to her bank account and managed Linda's finances. However, around August 2022, Latoya and Linda's longtime friend Velma Lewis were added to Linda's bank account.[3] Edward testified that once they were added to the account, the amount, about $8,000, was "basically liquidated."

¶7.     Betty Fowler testified that prior to the execution of the will, Linda called her, clearly

_____

[3] Dionne was designated as the payable on death beneficiary. Linda also executed a new power of attorney to Latoya and Velma.

upset, saying that she needed to change her will because of something Dionne said. Linda never told her what happened, but Betty claimed that Linda was adamant about getting in contact with her attorney to make changes to her will. According to Betty, Linda found out that Dionne told Latoya that she should have "closed the door and come on out" when she found Linda after her stroke.[4]

¶8.    Betty further testified that Linda left her property to her five adopted children because "her biological children had everything that they needed in life. She wanted to change her will because those five little children wasn't going to have no where to go, those adopted children, . . ." and because "Dionne and them is going to put them out if she didn't change it." During her testimony, Betty maintained that Linda's medical issues did not affect her mind or ability to understand what she was signing. Betty testified that Linda understood the nature of the document she was signing, and she was aware of her children and property. When she was asked whether the stroke affected her mentally, she responded, "I'm not saying it didn't affect her mentally at the time. I don't know, because I'm not a physician, but she called me from the hospital room." She further testified that the notary asked Linda if she understood what she was signing, and she responded, "Yeah, I requested it."

¶9.    The chancellor also heard testimony from Latoya and Velma, both alleging that Linda was of sound mind when she executed her will. During cross-examination, Latoya became uncooperative and hostile. The chancellor stated, "Hold on. That's unacceptable,

_____

[4] No proof of this alleged statement was ever presented to the chancellor.

4

unacceptable, unacceptable. Answer the questions that are asked. This is not a hostile court. Just answer the questions that are asked." When Edward resumed questioning Latoya, he elicited the following testimony:

Edward: On the day that the will was signed, August 9, 2022, can you tell us the time frame that they were going through the will signing procedures on that day?

Latoya: No, I don't know the time.

Edward: What was her condition on the 9th of August 2022?

Latoya: A normal day — a normal day for her.

Edward: Can you describe a normal day for her?

Latoya: You say y'all have been there, right?

Edward: Can you describe a normal day for her?

Latoya: You said y'all have been there, right?

The Court: Ms. Williams, answer the question asked. If you don't know –

Latoya: I don't know.

Edward: Was she admitted on that day to the hospital?

Latoya: I don't know.

Edward: Did you take her to the hospital that day?

Latoya: I don't know.

Edward: No further questions, Your Honor.

¶10. Considering all the evidence and testimony, the chancellor found, "Without this

evidence and knowledge of how different the second Will executed on August 9, 2022, is from the first Last Will and Testament executed by the Decedent, the [c]ourt is unable to decide as to its validity." The chancellor denied the petition to probate Linda's will and ordered the estate to proceed intestate.[5] On April 22, 2024, Latoya filed a motion to reconsider, which the chancellor ultimately denied. In its order denying the motion to reconsider, the chancellor stated that it is "not inclined to grant the Motion for Reconsideration and/or to Amend Order, as the will was executed under suspicious circumstances, and the decedent, from what the court can tell, lacked testamentary capacity to execute said will." Aggrieved, Latoya appeals.

## STANDARD OF REVIEW

¶11.    "In reviewing a chancellor's findings, we employ an abuse-of-discretion standard of review." *In re Harvey*, 399 So. 3d 186, 193 (¶17) (Miss. Ct. App. 2025) (citing *Mays v. Zumwalt (In re Est. of Amburn)*, 301 So. 3d 737, 740 (¶7) (Miss. Ct. App. 2020)). "This Court will not disturb a chancellor's findings of fact in a will contest unless the findings are clearly erroneous or manifestly wrong, or the chancellor applied an incorrect legal standard." *Id*. "However, when considering a question of law, we employ a de novo standard of review." *Id*.

---

[5] On appeal, Edward does not contest the chancellor's determination that Linda's estate should pass intestate. He argues in his brief that her determination under Mississippi law was "proper and fully supported by both the evidentiary record and applicable legal standards."

**DISCUSSION**

## I.     Testamentary Capacity

¶12.    The chancellor found that Linda lacked testamentary capacity to execute her will. "The burden of proving testamentary capacity is on the proponents of the will, who can present a prima facie case simply by offering into evidence the will and the record of probate. Our Supreme Court has held that although the burden shifts to the contestants to overcome the prima facie case, the burden of proof remains with the proponent to show by a preponderance of the evidence that the testator had capacity." *In re Smith*, 722 So. 2d 606, 611 (¶13) (Miss. 1998). Here, in support of his contention that Linda lacked testamentary capacity at the time the will was executed, Edward submitted unrebutted evidence that the will was executed the day Linda was admitted to the hospital. Edward also maintained that following her stroke in April 2022, Linda had experienced periodic states of confusion.

¶13.    After the contestants have attempted to rebut the prima facie case, the proponents may come forward with additional proof in rebuttal. *Id*.; *see Clardy v. Nat'l Bank of Com. of Miss.*, 555 So. 2d 64, 66 (Miss. 1989) (finding that the proponent of the will at all times bears the burden of persuading the trier of fact on all issues requisite to the validity of the will). Therefore, the burden to persuade the chancellor that Linda had the requisite testamentary capacity remained with Latoya, as the proponent.

¶14.    To have testamentary capacity, an individual must be of "sound and disposing mind." *Callington v. Gardner (In re Est. of Gardner)*, 228 So. 3d 921, 926 (¶21) (Miss. Ct. App.

2017) (quoting Miss. Code Ann. § 91-5-1 (Rev. 2013)). "Testamentary capacity is determined based on three factors: (1) whether the testator had the ability at the time of the will to understand and appreciate the effects of [her] act; (2) whether the testator had the ability at the time of the will to understand the natural objects or persons to receive [her] bounty and their relation to [her]; and (3) whether the testator was capable of determining at the time of the will what disposition [she] desired to make of his property." *Id*. Further, "[r]ecognizing that a testator may not always possess testamentary capacity, [the Supreme Court has] held that he may nevertheless execute a valid will during a lucid interval." *Est. of Gardner*, 228 So. 3d at 926 (¶21). Whether the testator has testamentary capacity is examined "at the time of the will's execution." *Noblin v. Burgess*, 54 So. 3d 282, 291 (¶32) (Miss. Ct. App. 2010).

¶15.    Betty's testimony, as the subscribing witness, "is entitled to greater weight than the testimony of witnesses who were not present at the time of the will's execution or did not see the testator on the day of the will's execution." *Noblin*, 54 So. 3d at 294 (¶43). However, it is important to note that Betty did not specify at what time or where the will was signed. Our review of the hospital records reveals that on the day the will was executed, Linda was admitted to the hospital because she had been nauseous and vomiting since the night before. Linda's physical illness alone would not be sufficient evidence to show Linda lacked testamentary capacity. *See In re Est. of Laughter*, 23 So. 3d 1055, 1061 (¶22) (Miss. 2019) ("The mere fact that someone is too ill to handle his affairs does not in and of itself render

8

him mentally incompetent or void of testamentary capacity."). However, Linda's periodic states of confusion and impaired orientation referenced in her medical records are significant and were appropriately considered by the chancellor. *See In re Est. of Byrd*, 749 So. 2d 1214, 1218 (¶13) (Miss. 1999) (finding that there is no reason why the testimony of the home health nurse and her notes from that should be given less weight than the subscribing witness).

¶16.    Again, "we will not disturb the factual findings of a chancellor when supported by substantial evidence unless [we] can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard." *Gussio v. Gussio*, 371 So. 3d 734, 745 (¶20) (Miss. Ct. App. 2023). The chancellor heard testimony attesting to Linda's state of mind about changing her will, properly considered Linda's hospital records noting periods of confusion, her orientation score being a two out of four the day the will was executed, the lack of evidence regarding the time the will was executed and moments of lucidity, and Latoya's unwillingness to provide any meaningful testimony on Linda's state of mind the day the will was executed. The chancellor was not persuaded by Latoya's claims that Linda had the requisite testamentary capacity to execute the will. We have held that "the chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Ingram v. Ingram*, 419 So. 3d 991, 996 (¶8) (Miss. Ct. App. 2025). Thus, after our review of the record, we find no abuse of discretion or error in the chancellor's finding that Linda lacked testamentary capacity to execute her will.

## II.    Undue Influence

¶17.    Our Supreme Court has found that in decisions involving a will contest on the ground of lack of testamentary capacity and the existence of undue influence, "[t]he issue is single,—will or no will. And, when we consider that the exercise of undue influence implies some degree of mental capacity to be overcome, and how indissolubly the two things are implicated the one in the other, it seems to us clear that the burden as to both is on the proponent throughout, and there is no shifting of this burden." *Blalock v. Magee*, 205 Miss. 209, 38 So. 2d 708, 712 (1949). In the case before us, the chancellor's finding that the will is invalid is supported by substantial evidence on the ground of the lack of testamentary capacity. Accordingly, we decline to address the issue of undue influence because the lack of testamentary capacity is dispositive.

## CONCLUSION

¶18.     For the foregoing reasons, we affirm the chancellor's judgment.

¶19.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER AND LASSITTER ST. PÉ, JJ., CONCUR.**