877 So.2d 406 (2003)
In the Matter of the ESTATE OF Mary M. PIGG, Deceased.
Earl J. McClendon, Individually, and as Executor, Appellant,
v.
David L. McClendon, Hugh I. McCLendon, Myrtis M. Doyle and Sharon M. Wheetley, Appellees.
No. 2002-CA-00980-COA.
Court of Appeals of Mississippi.
September 16, 2003.
Rehearing Denied November 18, 2003.
Certiorari Denied July 15, 2004.
*408 Nathan P. Adams, Greenville, Attorney for Appellant.
John H. Cox, Mendenhall, Attorney for Appellee.
Before SOUTHWICK, P.J., THOMAS and IRVING, JJ.
SOUTHWICK, P.J., for the Court.
¶ 1. The executor under a last will and testament appealed the decision of a chancery court jury finding in favor of those who challenged the will. We agree that there was insufficient evidence that testamentary capacity or undue influence had been exerted. We reverse and enter judgment that the will be admitted to probate.

FACTS
¶ 2. Mary McClendon Pigg died in July 2000 at the age of eighty. She executed a last will and testament on April 10, 1997. Throughout the first half of 1997, Mrs. Pigg suffered several emotional and physical setbacks. Her spouse of many decades died in January. Mrs. Pigg was diagnosed with breast cancer and underwent surgery for that condition. She suffered a serious bout of gastrointestinal bleeding and, finally, had back surgery.
¶ 3. The dispositive paragraphs of the will bequeathed certain items of personalty to named family members with the remainder of the estate liquidated and distributed in various percentages to her siblings of the half blood as follows:
(1) David McClendon, Frank McClendon, Joe McClendon and Sharon McClendon Wheetley each received five percent, with the provision that if any should predecease Mrs. Pigg, that portion would be divided equally among all the remaining siblings.
(2) Delores McClendon Long, Annie Bell McClendon Murphy and Myrtis McClendon Doyle each received fifteen percent, with the provision for distribution *409 in the event any should predecease Mrs. Pigg.
(3) Earl McClendon and his wife, Juanita, were given thirty-five percent with the survivor of the two taking the entire share in the event either predeceased Mrs. Pigg. Earl McClendon was also named executor of the estate with his wife as the alternate in the event Earl did not serve.
¶ 4. One sibling, Hugh McClendon, was omitted from the specific bequests completely.
¶ 5. The will was admitted to probate on July 20, 2000, and letters testamentary issued to Earl McClendon on July 25, 2000. David McClendon, Hugh McClendon, Myrtis Doyle and Sharon Wheetley filed an objection and contest to probate on August 3, 2000, claiming lack of testamentary capacity and undue influence by Earl McClendon.
¶ 6. The matter was tried before a chancery court jury. A total of fifteen witnesses testified and numerous exhibits were presented. After three days of testimony, the jury found in favor of the contestants. This appeal followed.

DISCUSSION

1. Admission of will into evidence
¶ 7. Earl McClendon argues the chancellor erred by refusing to admit into evidence the probated will in common form, along with the record of probate. These items were received by the court for identification only but not admitted into evidence on the ground that the jury would by that admission improperly believe that the will must be valid. The court allowed a conformed copy of the will to be admitted into evidence, in which the actual signatures did not appear.
¶ 8. The proponent of a contested will bears the burden of proving its validity in all respects. Harris v. Sellers, 446 So.2d 1012, 1014 (Miss.1984). A prima facie case of validity is made when the will and its record of probate are admitted into evidence. Id. The contestants then bear the burden of going forward with evidence to challenge the will's validity. Id.
¶ 9. The estate is correct that it was error for the chancellor not to admit this probate record into evidence. The estate alleges reversible prejudice because the jury received only the conformed copy rather than being given a document signed and initialed on each page by the testator. Still, the estate was not found to have failed to make its prima facie case. Any concerns about juror confusion due to the appearance of the conformed copy of the will could have been rectified with testimony or an explanation during closing argument. This error does not cause reversal.

2. Motions for directed verdict
¶ 10. The estate made motions for a directed verdict at two stages of the trial based upon the argument that the contestants had failed to offer sufficient evidence to support a finding of either lack of testamentary capacity or of undue influence. The motions were denied. We would reverse on that basis only where the evidence of an element of the claim is so lacking that reasonable jurors could find only for the non-movant. Harrison v. McMillan, 828 So.2d 756, 764 (Miss.2002).

a. Testamentary capacity
¶ 11. Once the will proponents have established the prima facie case, the initial burden of proof has been satisfied. The obligation of going forward then falls to the contestants to provide evidence to support the factual basis of the challenge that they make.
*410 ¶ 12. Testamentary capacity is a necessary prerequisite to a valid will. Miss.Code Ann. § 91-5-1 (Rev.1994). We look to three factors measured on the date of the will to determine the issue of capacity: (1) Did the testatrix have the ability to understand and appreciate the nature and effect of her actions? (2) Did the testatrix have the ability to recognize the natural objects or persons of her bounty and their relation to her? (3) Was the testatrix capable of determining what disposition she desired to make of her property? Estate of Wasson v. Gallaspy, 562 So.2d 74, 77 (Miss.1990).
¶ 13. Other than Earl McClendon, who was called as an adverse witness, only two witnesses for the contestants were asked about Mrs. Pigg's mental status, Myrtis Doyle and Mrs. Pigg's physician, Dr. Blaylock, who testified via deposition.
¶ 14. Ms. Doyle testified that Mrs. Pigg was on many medications and experienced hallucinations during her April 1997 hospitalization. The witness qualified her statement by noting that "this was before she was transferred to DRMC to have her back surgery." Mrs. Pigg's back surgery occurred approximately one week prior to the date that she executed her will. Doyle testified that she was not present at all on April 10, 1997, and offered no evidence as to Mrs. Pigg's capacity on that date.
¶ 15. In his deposition, Dr. Blaylock gave this opinion:
[S]omeone [who] had that many multiple problems, certainly they felt bad, and I'm not sure that they would be thinking rationally. I'm thinking in general terms. If any of us have that many problems, I think, you know, maybe we just don't  it's difficult for us to make a decision. I'm thinking of four years ago, because I don't remember. My note didn't indicate anything other than she was uncomfortable.
¶ 16. Dr. Blaylock did not have any record of seeing Mrs. Pigg on April 10, 1997, only April 9 and April 11. By his own words, Dr. Blaylock was speaking only in the most general terms that someone in Mrs. Pigg's physical condition might not be thinking rationally. He offered no opinion as to Mrs. Pigg's actual mental status on April 10, 1997.
¶ 17. Earl McClendon testified that Mrs. Pigg was in physical discomfort but remained rational.
¶ 18. At the close of their case, the contestants had produced no evidence that Mrs. Pigg failed to have sufficient mental capacity on the critical date of April 10, 1997. The medical records throughout her hospitalization indicated that Mrs. Pigg was alert and oriented, including an assessment completed just a few hours prior to the execution of the will and another one afterwards. The medical records and Dr. Blaylock's testimony show that Mrs. Pigg received no pain medications until after eight o'clock P.M. on the date that she signed her will around noon.
¶ 19. More importantly, the proponent presented the testimony of Murray and Patricia Akers. Mr. Akers was the attorney who prepared the will. Mrs. Akers works occasionally in her husband's law office. Both acted as witnesses to the execution of Mrs. Pigg's will. Mr. Akers was first contacted by Earl McClendon about drawing up a will for Mrs. Pigg in March 1997. Mr. McClendon placed the call, but Mr. Akers spoke to Mrs. Pigg about her testamentary wishes. Several more conversations between attorney and client took place over the next few weeks during which Mrs. Pigg made known her wishes and Mr. Akers advised her how best to achieve those goals.
¶ 20. Both of the Akers testified that Mrs. Pigg appeared to be in physical discomfort *411 on the morning in question. They also testified the meeting with Mrs. Pigg lasted approximately thirty minutes, during which time Mr. Akers went over the dispositive paragraphs of the will with Mrs. Pigg at least three times and Mrs. Pigg asked and responded to questions appropriately.
¶ 21. The testimony of a subscribing witness is entitled to greater weight than that of witnesses who were not present at the time the instrument was executed or who did not see the testatrix on that day. Estate of Edwards v. Edwards, 520 So.2d 1370, 1373 (Miss.1988).
¶ 22. There was no indication that Mrs. Pigg lacked testamentary capacity in the conversation as recounted by both Murray and Patricia Akers. On the contrary, she left her estate to the natural objects of her bounty, although not in the amounts some beneficiaries would have preferred. Given her specific bequests, instructions on liquidating the remainder of her assets and the precise percentages she sought to see distributed to her siblings, Mrs. Pigg was capable of determining the property disposition that she wished. Finally, her questions to Mr. Akers, including how to disinherit someone, shows she was cognizant of the nature of her actions.
¶ 23. It was error to give the issue of testamentary capacity to the jury.

b. Undue Influence
¶ 24. A will is said to be the product of undue influence when an adviser has been so importunate as to subdue the testator's will and free agency. Longtin v. Witcher, 352 So.2d 808, 811 (Miss.1977). Such may be accomplished through a variety of methods, such as advice, arguments, or persuasion. Id. However, not all influence exerted is undue. The influence must have been so overwhelming that the resulting instrument reflected the will of the adviser rather than the testator. Greenlee v. Mitchell, 607 So.2d 97, 105 (Miss.1992).
¶ 25. If a confidential relationship existed between the testatrix and the other party, a presumption that there was undue influence arises which must be rebutted by clear and convincing evidence. Estate of Smith v. Averill, 722 So.2d 606, 611 (Miss.1998). In the absence of such a relationship, no presumption exists. Greenlee, 607 So.2d at 105. Here, the contestants did not plead nor seek to prove a confidential relationship between Earl McClendon and Mary Pigg.
¶ 26. As discussed earlier regarding testamentary capacity, a prima facie case of the validity of a will is established with the record of probate. Thereafter, the contestants must present some evidence of the basis on which the will is being challenged. The contestants called Elsie Skelton and Lorraine Harper, who were friends of Mrs. Pigg. Harper testified that Mrs. Pigg spoke of her will a few weeks before her death in July 2000. According to Harper, Mrs. Pigg was "real disturbed" and "just unhappy" about her will, telling Harper that she had made a "bad mistake" with the will. Mrs. Pigg stated that she had not seen her will and did not know its contents, that Earl McClendon was "involved in the execution of the will," and that Mrs. Pigg wanted her property divided equally among her siblings.
¶ 27. These statements regarding Mrs. Pigg's knowledge of her will's location in 2000 and her desire at that time to have all her property distributed equally are of no relevance to the issues of testamentary capacity and undue influence in 1997. Her statement that she had not seen her will cannot be stretched to imply that she had not seen it three years earlier, as indeed *412 she signed it. At most, jurors could have concluded that in the year 2000, Mrs. Pigg had not seen her will recently, disagreed with what she remembered was on the will, and now wanted her property to go equally to her heirs. The only relevant information here was that Mrs. Pigg recalled in 2000 that Earl McClendon was involved in 1997 in the execution of the will.
¶ 28. Skelton also related comments made by Mrs. Pigg. She stated in 1997 that she had gotten tired of being "hounded" by Earl McClendon about the will and thus signed it. She did not then know the contents of her will; she wished to make a will in which all of her siblings shared equally.
¶ 29. The estate objected to the testimony of each witness because it was irrelevant, it was hearsay, and it was remote in time from the execution of the will. Out-of-court statements offered to prove the truth of their contents are excluded from evidence, absent an applicable hearsay exception. M.R.E. 802. One exception is for the admissibility of statements of memory or belief that relate to the execution, revocation, identification or terms of the speaker's will. M.R.E. 803(3).
¶ 30. Harper did relevantly report Mrs. Pigg's recollection that Earl McClendon was involved in the execution of the will. The remainder of the Harper testimony was irrelevant, remote, and hearsay not covered by any exception.
¶ 31. The Skelton hearsay was less remote. It apparently came from a conversation with Mrs. Pigg a few weeks or at most months after the will was executed. At one stage Skelton indicated that the conversation was after the year 1997, but jurors could find that the better interpretation of her testimony was that the statements were made not long after Mrs. Pigg returned home from the rehabilitation center about a month after the will was prepared in April 1997. Many of the statements are ambiguous, such as Mrs. Pigg's stated lack of knowledge of the contents of her will. It is unclear from the testimony whether Mrs. Pigg meant she could not then remember the contents or that she had never known them. Similarly, the statements regarding wishing to make a will leaving her estate equally to her siblings merely expressed a current desire to change the terms of her will. There also is an apparent contradiction in the testimony-Mrs. Pigg was ignorant of the contents of her will but cognizant enough of the terms to know that she wished to change them.
¶ 32. The question now is whether the Skelton hearsay created a jury issue. Those contesting a will need not present sufficient evidence to prove undue influence. The contestants, however, must at least raise sufficient question to cause jurors to conclude that the proponents failed to prove that the will was free of improper influence:
At the outset the proponent bears the burden of producing evidence of due execution and testamentary capacity.... These offerings make out what is referred to as the proponent's prima facie case, meaning only that in such a state of the record the proponent is entitled to survive the contestant's motion for a directed verdict, in the event the case is heard before a jury, and that a jury verdict upholding the will may survive a motion for judgment notwithstanding the verdict. In the event no further proof is offered in a non-jury trial, the proponent will have carried its burden of persuasion sufficient to survive a motion to dismiss....
Once the proponent has shouldered his burden of production such that he has made out a prima facie case, the burden of production shifts to the contestants. *413 What is critical for present purposes is that the burden of persuading the trier of fact on the issues of due execution and testamentary capacity rests on proponent throughout and never shifts to the contestants. That burden of persuasion is subject to the familiar preponderance of the evidence standard.
Clardy v. Nat'l Bank of Commerce of Miss., 555 So.2d 64, 66 (Miss.1989) (footnote and citations omitted).
¶ 33. In summary, those who would set the will aside need not prove that improper influence was brought to bear. The proponents still have the burden to prove that the will was the product of the free will of the testatrix. This is an almost imaginary distinction, though. The level of proof of due execution is one of preponderance of the evidence, i.e., somewhat more evidence of validity than in opposition to it. In a practical sense, it would be difficult for rational jurors to draw the line quite so fine such that even without finding a preponderance in favor of undue influence, they also would not find a preponderance in favor of the will's proper execution. Still, this is the standard.[1]
¶ 34. The Supreme Court addressed this nuance when it explained that since "it was incumbent upon the proponents, by a preponderance of the evidence, to reasonably satisfy the mind of the jury that the instrument was, in truth, the last will of the deceased," then "if all the evidence in the case left it doubtful whether the instrument propounded was the true last will of the deceased, the jury should find against its validity...." Blalock v. Magee, 205 Miss. 209, 250-51, 38 So.2d 708, 714 (1949). A jury instruction which tried to explain the concept of being left in doubt might be confusing. The better practice was simply to inform the jurors that the validity of the will must be established by a preponderance of the evidence. Id., at 252, 38 So.2d at 714.
¶ 35. The evidence for this jury was that Earl McClendon had been involved in the execution of the will. By itself, evidence of involvement creates no basis on which to choose between proper assistance and improper influence. There was evidence that at some time after the date of the will, Mrs. Pigg was dissatisfied with its distribution of property. Changes in testamentary disposition are frequently made between the time of an initial will and death; the desire for such changes does not call into question the validity of the initial will. Earl McClendon was said to have "hounded" Mrs. Pigg regarding the instrument. The word "hounded" is pregnant with a variety of meanings, most of which would not rise to domination. What did that mean: hounded to write a will but not to make any particular distribution, hounded to leave more to him than to others but without her desires being *414 overridden, or actually being unduly influenced? To rephrase her statement to fit the issue, it is as if Mrs. Pigg was quoted to say "maybe I was unduly influenced, and maybe I was not."
¶ 36. The jurors had to decide if the inferences of undue influence made the quantum of evidence in support of due execution less than a preponderance. The best evidence on the issue was the testimony of the subscribing witnesses and others who were present during the execution. From no one contemporaneously involved, as a party in interest, as the attorney, or as a bystander, was there any suggestion that Mrs. Pigg was unaware of what she was doing or that her personal desires had been overwhelmed by someone else. Doubts about due execution that arise solely from speculation are insufficient. That would be too light a counterweight to the evidence of proper execution.
¶ 37. Had it been the contestants who were to carry the burden of proving undue influence, the proof would have had to rise to the level of a probability:
When the inquiry is upon an issue whether a certain alleged fact existed or happened in the past, it is not sufficient to prove only or no more than a possibility, however substantial the possibility may be, so long as it is only a possibility. There the proof must establish the fact as a probability, using that word in its ordinary and common acceptation.
Gulf Ref. Co. v. Williams, 183 Miss. 723, 185 So. 234, 236 (1938). Since instead it was the proponents of the will who had the burden of proof, the contestants at least had to introduce enough so that reasonable jurors could conclude that it was improbable that the will was written free of undue influences. To reach that conclusion, they had evidence from those present at the execution, offset by the word "hound" and Mrs. Pigg's complaints a month or more later about the property distribution. Only speculation could have placed such weight on these inherently ambiguous words so as to leave the evidence of due execution at less than a preponderance. This was not sufficient evidence to make the question of undue influence one for the jury.
¶ 38. We therefore reverse, order that the will be admitted to probate, and remand for such further proceedings as are necessary to implement our mandate.
¶ 39. THE JUDGMENT OF THE CHANCERY COURT OF WASHINGTON COUNTY IS REVERSED, THE WILL IS FOUND TO BE VALID AND IS ADMITTED TO PROBATE. THE CAUSE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
McMILLIN, C.J., KING, P.J., BRIDGES, THOMAS, LEE, IRVING, MYERS, CHANDLER and GRIFFIS, JJ., CONCUR.
NOTES
[1] Some older cases placed the burden of proving undue influence on the will's challenger:

The complainants assume the burden of showing by clear and convincing testimony that Miss Caraway was mentally incapacitated to execute a deed or that the conveyance was procured by undue influence. In this case there was no confidential or fiduciary relationship between the parties now contesting. Therefore:
"Primarily, the person alleging that a contract, deed, gift, or will was procured through the exercise of undue influence has the burden of proving that fact. * * * The proof must be clear and convincing." BLACK ON RESCISSION AND CANCELLATION, vol. 1, par. 253.
Gillis v. Smith, 114 Miss. 665, 75 So. 451, 452-53 (1917). In light of the more recent precedents that we cite, we find such rules have been displaced as to wills regardless of whether they might still apply to the contest of deeds.