# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-00821-COA

| | |
|---|---|
| IN THE MATTER OF THE ESTATE OF ROSELLE TURNER ROGERS, DECEASED: FREDERICK M. ROGERS, JR. | APPELLANT |
| v. | |
| WALTER T. ROGERS, EXECUTOR, WALTER T. ROGERS, INDIVIDUALLY, AND WILLIAM T. ROGERS | APPELLEES |

| | |
|---|---|
| DATE OF JUDGMENT: | 04/15/2016 |
| TRIAL JUDGE: | HON. ROBERT L. LANCASTER |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | EDDIE JACOB ABDEEN |
| | SAM STARNES THOMAS |
| | BENJAMIN ADAMS DUNCAN |
| ATTORNEYS FOR APPELLEES: | ROBERT H. COMPTON |
| | GRACE WATTS MITTS |
| | JOHN G. COMPTON |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 07/17/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., WILSON AND TINDELL, JJ.**

**WILSON, J., FOR THE COURT:**

¶1. This appeal follows a jury trial in a will contest. The contestant, Frederick Rogers, alleges that his mother's will was the product of his brother's undue influence. However, the jury found that the will was valid, and the chancellor entered judgment on the verdict. On appeal, Frederick argues (1) that the chancellor should have given a peremptory instruction that there was a presumption of undue influence; and (2) that there is no substantial evidence

to support the jury's verdict. However, we find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Roselle "Boots" Turner Rogers and her husband, Fred, were longtime residents of Meridian. Fred was an attorney and a member of the Mississippi Senate. Fred also raised cattle and had extensive holdings of timberland. Fred and Boots had three sons: Frederick, born in 1946; Walter, born in 1949; and William, born in 1952.

¶3.     Fred and Boots made wills in 1975. Each left his/her entire estate to the other spouse and to their three sons in equal shares if the other spouse was already deceased. Prior to his death, Fred deeded to his three sons, in equal shares, his one-half interests in 799-acre and 160-acre tracts of timberland in Alabama.[1] He also deeded four tracts in Mississippi to his sons: two 60-acre tracts to Frederick, one 60-acre tract to Walter, and one 60-acre tract to William. The Mississippi tracts were part of a 320-acre tract known as the "Smith-Rhyne Tract." Fred died in June 1996, leaving Boots his entire estate, including 838 acres of timberland in Lauderdale County and a two-thirds interest in a total of 798 acres in Kemper County. Fred's will also provided that Boots could designate assets of a specified value as a life estate in her, which would pass to her sons upon her death. Boots subsequently made such a designation. *See infra* ¶22.

---

[1] Walter testified that Frederick later wanted to sell the 799-acre tract, but Walter and William did not want to sell it. Walter and William eventually agreed to trade their interests in the 799-acre tract to Frederick in exchange for his interests in other family lands, known as "Gully Place" and "Whitsett Field." Frederick "immediately sold [their combined interests in the 799-acre tract] and made $400,000."

¶4. On December 26, 1996, the family established The Fred M. Rogers Family Limited Partnership to hold timberland then owned by Boots. The partnership's primary purpose was as an estate planning device. The partnership agreement named Boots the "General Partner" and "Managing General Partner" and provided that initially she would have a 97% interest in the partnership, consisting of a 1% general partner interest and a 96% limited partner interest. The agreement named Frederick, Walter, and William as "Limited Partners" and "successor Managing General Partners" and granted each of them a 1% limited partner interest. The same day, Frederick's wife and three children, Walter's wife and three children, and William's wife and four children were all added to the partnership as limited partners. Thus, there were a total of sixteen limited partners. Boots also signed a power of attorney designating Frederick, Walter, and William as her attorneys-in-fact. Walter, an attorney,[2] prepared the partnership agreement and the power of attorney. Fred's former accountant, Bob Rea, provided Walter with a template for the partnership agreement.

¶5. Boots planned to make lifetime gifts of her partnership interest to reduce the value of her estate and future estate tax liability. Specifically, she planned to make annual gifts of $10,000 of partnership equity to each of the limited partners (i.e., $160,000 total per year). She made gifts to all sixteen limited partners in December 1996 and again in January 1997.

---

[2] Walter has been a practicing attorney in Meridian since 1974. Frederick also lives in Meridian, and at the time of trial he was the Vice President, Chief Resource Officer, and Facility Manager for Rush Health Systems. William retired from BellSouth in 2002. He resides in Brandon, but he frequently stays on family property in Lauderdale County.

Walter and William testified that Bob Rea recommended this estate planning strategy at a 1996 meeting with Boots and all three brothers. However, Frederick denied that he attended such a meeting. He claimed that he first learned about the partnership from Walter.

¶6.     When the partnership was established, Boots conveyed 200 acres of timberland, known as the "Tom Lyle Tract," to the partnership, and the timber on the tract was sold. Boots used proceeds from timber sales to make $10,000 annual cash gifts to her children and their spouses and children. These gifts, which were in addition to the equity gifts, began in December 1996 and continued each year at Christmas for eleven years.

¶7.     In July 1997, Boots conveyed her interests in three additional tracts of timberland to the partnership. On the same day, Boots also conveyed the remaining 80 acres of the Smith-Rhyne Trace (*see supra* ¶3) and a separate 88-acre tract to Frederick, Walter, and William as tenants in common. Additional tracts were transferred to or acquired by the partnership in later years. Walter prepared all relevant deeds.

¶8.     In 1997, Walter called a meeting at his law office to discuss management of the partnership's timberland. Frederick, Walter, and William met with Ricky Goforth, a registered forester who had appraised the timberland included in Fred's estate. According to Frederick, Goforth recommended planting 300 to 350 trees per acre on the partnership's timberland. Frederick testified that he "took exception to" this because Fred had always planted 700 to 750 trees per acre. However, William and Walter agreed with Goforth. Frederick testified, "I kind of took the position, right then, that it was going to be like a two

4

to one vote on anything that happened, and I just kept that to myself and left."

¶9. On December 16, 1997, Frederick informed Walter by letter that he "desire[d] to dissolve [his] interest in the partnership by having his future interest bought out." Frederick testified that he sent the letter because he felt that Walter and William would always outvote him, that he would "be wasting [his] time trying to be involved," and that "anything [he] would say would not be taken into consideration." Frederick's letter stated:

> Dear Walter:
>
> After careful review and consideration, I would like to opt for an option afforded to me in [the partnership agreement]. I desire to dissolve my interest in the partnership by having my future interest bought out by an agreed upon amount that can be paid either by lump sum, or over a period not to exceed 10 years. I believe my interest, if any, has to be offered to the partnership for purchase before any other action can be taken. I would also like to offer for sale to you, William, the both of you, or the partnership, my full interest in the [two 60-acre tracts that were part of the Smith-Rhyne Tract]. I believe per the partnership agreement, you as the partnership's agent for service of process, are to be notified of a request such as I am making. I also believe per [the partnership agreement] that the offer for sale of the [two 60-acre tracts] must first be made to the partnership, and I am to give the partnership a 60 day period of time in which to act on my request. I am not setting a price for the [two 60-acre tracts], but will leave it up to you to tender me a fair offer based on a per acre cost for 4 year old planted pine plantation land, planted at 750 trees per acre, with an 85% survivability rate. This can be determined by you or a registered forester. This tendered offer will then be considered and accepted, rejected, or negotiated.
>
> As for my future worth in the partnership, if any, at 51 years old I believe my interest can be invested in mutual funds, money market accounts, etc. such as I have done with my Bell South pension, and draw a higher rate of return than new planted pine plantation land or timber which may be growing at a 10% growth rate.

¶10. Walter testified that Frederick's letter "shocked" him because their mother wanted to

keep the land together in the family. Moreover, as Walter saw it, Frederick was essentially asking their mother to pay him in advance for future gifts and his eventual inheritance. Walter took the letter to Boots, since she was the managing general partner—and the then-owner of the "future interest" that Frederick wanted "bought out."

¶11. Walter testified after Boots read the letter, she said that she would "need to change [her] will." Walter told Boots that he could not help her make a new will. Walter said that she could make an appointment with the Wilbourn law firm, since Boots knew Richard Wilbourn. Because Wilbourn was no longer actively practicing law, Walter suggested that she could talk to Wilbourn's law partner, Don Rogers.[3] However, Boots did not tell Walter what she intended to do about her will, and Walter testified that he did not know until sometime later whether she contacted or met with Rogers or executed a new will.

¶12. Walter did call Don Rogers "as a courtesy" to tell him that Boots "might call and she might not." Walter and Rogers knew one another professionally, but they were not close friends and did not socialize.[4] Both Walter and Rogers testified that their conversation lasted less than a minute, they did not discuss any matters of substance, and they did not discuss Boots's will again until several years later.

¶13. On January 6, 1998, Walter sent a response to Frederick's letter. Walter asked whether Frederick's wife, Barbara, and children also wanted out of the partnership. He also

---

[3] Rogers is not related to any of the parties.

[4] Walter and Rogers acknowledged at trial that Rogers later represented Walter and William in a related lawsuit filed by Frederick.

6

asked whether Frederick wanted to sell his interest in certain other family land. Finally, Walter stated that he could not make an offer on Frederick's part of the Smith-Rhyne Tract because he lacked sufficient information about that land.

¶14.   On January 22, 1998, Boots made her annual transfers of partnership equity. Because of Frederick's stated desire to dissolve his interest in the partnership, Boots did not transfer equity to Frederick or his family in 1998. Nor did she transfer equity to Frederick or his family in 1999, 2000, or 2001. In those years, she transferred equity only to Walter and William and their families. However, each Christmas, Boots continued to make $10,000 cash gifts from timber proceeds to Frederick, his wife, and each of his children. Frederick and his family received approximately $550,000 in such gifts from 1996 to 2006.

¶15.   On January 22, 1998, Boots also signed a new power of attorney that designated only Walter and William as her attorneys in fact. She also signed an amendment to the partnership agreement that removed Frederick as a "successor Managing General Partner," leaving Walter and William as the only successors. Walter and William and their wives signed the amendment, and Walter and William signed on behalf of their children. At trial, Walter acknowledged that he did not tell Frederick about the amendment. Walter testified that Boots's signature was the only signature that was necessary because the partnership agreement could be amended with the approval of the general partner(s) and limited partners holding 70% of the limited partnership interests. At that time, Boots was the only general partner and still held over 70% of the limited partnership interests. However, as Frederick

7

pointed out at trial, the amendment did not comply with the partnership agreement's requirement that proposed amendments must be submitted to the limited partners with advance notice and an opportunity to respond.

¶16. On February 2, 1998, Frederick responded to Walter's January 6 letter. With respect to his wife and children, Frederick's letter stated only, "I am in discussion with Barbara and the girls as to our interest in the partnership and will inform you of our decision very shortly." However, Frederick did not follow up with Walter. Walter testified that they did not discuss the issue again until 2001. Walter apparently interpreted Frederick's silence to mean that Frederick's family no longer wanted to participate in the partnership. In contrast, Frederick claimed that because Walter did not follow up with him, he assumed that he and his family would continue to participate in the partnership.

¶17. In February 1998, Boots contacted Don Rogers's office and made an appointment to discuss a new will. She met with Rogers in his office on February 18, 1998. Rogers testified at trial, and his file was admitted into evidence. Rogers's contemporaneous handwritten notes from the meeting reflect that Boots began by telling him that "Frederick want[ed] out of the partnership." Rogers testified that he talked with Boots for about an hour. They discussed her assets, the family partnership, her children and grandchildren, and what she wanted in her will. With Boots's consent, Rogers then recorded part of their meeting to show what they had discussed and that Boots "knew what [she] was doing." Rogers kept the recording in his file, and it was admitted without objection at trial.

8

¶18.   During the recorded portion of the meeting, Boots stated that she drove herself to Rogers's office, that she had no difficulties driving, and that she came to the meeting alone. Boots discussed Fred's death and identified all of her children and grandchildren. She then discussed, in general terms, the family's timberland and the purpose and operation of the family partnership. She stated that upon her death, she wanted her remaining interest in the partnership, if any, to pass to Walter and William. She explained that Frederick "wanted to get out of [the partnership]" and "would've already gotten his." Boots then discussed a number of specific bequests of personal property to children and grandchildren. Near the end of the recording, Boots stated that it was "only fair" that Frederick not receive any additional interest in the partnership because he wanted out and, therefore, "the burden" of maintaining the land and partnership would fall on Walter and William. Finally, Boots confirmed that she wanted a new will and that no one was "making [her] do this."

¶19.   At the end of their first meeting, Rogers asked Boots to take some additional time to think about what she wanted and then write him a letter stating specifically what she wanted in her will. He told her that the letter should not be typed but should be in her own handwriting. Boots wrote several drafts of the letter, which were found after her death and admitted into evidence without objection. On March 24, 1998, she sent Rogers a handwritten letter stating what she wanted in her will. The letter was admitted into evidence without objection, and there is no dispute as to its authenticity. Boots's letter stated in part:

> Since [Frederick] does not want to be a part of the partnership, this will leave William and Walter the jobs to do in taking care of the land. More than this,

9

we will have to pay forestry management, keep up land lines, fight bugs, and although I hope not, we may have to fight fires as their father did before them. Since they have their own jobs in earning their livelihoods, this will be an imposition on them, so I am considering this in my will. Thus, I wish to leave the partnership land to [William and Walter] and their heirs.

¶20. After Rogers received Boots's letter, the two spoke briefly by telephone, Rogers drafted a new will based on her letter, and they met again in Rogers's office on March 27, 1998. On that date, Boots executed her new will with Rogers, his administrative assistant, and Richard Wilbourn as subscribing witnesses. The three-page will first makes specific bequests of personal property to all three sons and to grandchildren. Next, the will leaves all of Boots's interest in the partnership and all of her real property to Walter and William in equal shares. The will explains: "Frederick . . . has expressed an interest in not owning real property in our family partnership or otherwise. Therefore, I am making gifts of other types of property to him and to his family during my lifetime, and I am not including him in this partnership and real property bequest." Finally, the will leaves the residuary of the estate to all three of her sons in equal shares. The will names Walter as the executor and William as the alternate executor.

¶21. With Boots's consent, Rogers also recorded part of their March 27 meeting, and the recording was admitted into evidence without objection. During the recorded portion of the meeting, Boots stated that the will reflected her wishes, including her desire to leave her partnership interest to Walter and William. She stated that she was not leaving Frederick an interest in the partnership because he wanted out of it. Boots stated that she again drove

10

herself to the meeting and came alone. Indeed, she stated, "Nobody [else] knows about [the meeting]." Rogers asked whether "Walter or William [was] making [her] do this," and Boots answered, "Oh, heavens, no." There is no dispute that Boots was of sound and disposing mind when she executed her will. At trial, without objection, the chancellor gave the jury a peremptory instruction that Boots possessed testamentary capacity.

¶22. On February 11, 1999, Boots signed a designation of the assets to be included in her life estate pursuant to Fred's will. *See supra* ¶3. The document was filed later in Fred's estate proceeding. Boots designated an investment account with a balance of $178,500 as payable on death to Frederick. She designated $178,500 in partnership equity as payable on death to Walter and $178,500 in partnership equity as payable on death to William. When Boots died in 2013, the investment account passed to Frederick with a balance of approximately $174,000. Walter testified that the designations for him and William were essentially moot by the time Boots died because, as explained below, she distributed virtually all of her partnership equity during her lifetime. Thus, those two designations resulted in only a minor "bookkeeping entry" in the partnership's records.

¶23. Walter testified that around April 2001, Frederick called him to ask why Boots had stopped making annual transfers of partnership equity to his wife and children. According to Walter, Frederick said, "I understand why Mama did what she did with me, but what about Barbara and the children?" Walter testified that he reminded Frederick that he did not answer Walter's prior inquiry about whether Barbara and the children wanted to remain in

11

the partnership. *See supra* ¶16. Walter testified that Frederick then stated that his wife and the children did want to continue to participate. Therefore, annual equity transfers to Frederick's wife and children—but not Frederick—resumed in January 2002 and continued through 2008. Frederick and his family received K-1 statements reflecting their partnership interests each year, which would have shown that Barbara's and the children's partnership interests were increasing while Frederick's was not.

¶24. In September 2006, Boots assigned half of her 1% general partner interest to Walter and William—0.25% to each of them. At trial, Walter acknowledged that the transfer did not comply with a provision of the partnership agreement that required all partners' approval of any transfer of a general partner interest.

¶25. In January 2009, Bob Rea informed Walter that Boots had only a small amount of equity remaining in the partnership—an amount insufficient to make her normal annual transfers. In other words, the partnership had accomplished its estate planning purpose. Accordingly, no equity transfers were made in 2009 or thereafter.

¶26. At trial, Frederick claimed that he "first came to believe things [with the partnership] were amiss" in March 2009. He claimed that Bob Rea accidentally mailed him all partners' K-1 statements, rather than just his family's statements. Frederick testified that when he compared the statements, he realized—for the first time—that he and his family had much smaller interests in the partnership than Walter and William and their families.

¶27. In November 2009, Frederick wrote to Walter to ask why his family had been omitted

12

from partnership equity transfers from 1998 through 2001. In a response letter, Walter reminded Frederick that no equity was transferred to Frederick's family members in those years because Frederick never stated whether they wanted to continue to participate in the partnership. *See supra* ¶¶16, 23. Walter's letter stated that the transfers resumed once Frederick "called and [stated that his] family would remain in the partnership." Walter's letter further noted that he and Frederick had discussed this issue previously.

¶28. On December 31, 2009, Frederick asked Boots to sign an amendment to the family partnership agreement that purported to (1) reinstate him as a "successor Managing General Partner" and (2) prohibit "distributions" until he and his family were "brought current" and received all "distributions" to which they were "entitled." Boots signed the amendment. Frederick and his wife and children also signed. On January 7, 2010, Frederick sent Walter a copy of the amendment and requested a meeting.

¶29. Boots was ninety years old when she signed the amendment. Frederick claimed that she was competent. According to Frederick, Boots stated that she wanted the partnership to be "straightened out." However, Walter testified that by 2009, Boots was "suffering from . . . a loss of memory and . . . would not have remembered what she had done in the past." She was also taking ten prescription medications, including painkillers. Walter wrote to Frederick that he was disappointed that Frederick had "taken advantage" of Boots's diminished condition. Walter's letter also stated that the purported amendment was ineffective because Boots had distributed virtually all of her partnership equity to her

13

children and grandchildren.  Therefore, the signatories' combined partnership interests were insufficient to approve the amendment.

¶30.    In 2011, Frederick and his family sued Walter and William in the Lauderdale County Chancery Court.  The complaint alleged, among other things, that Walter and William breached the family partnership agreement, breached their fiduciary duty to Frederick's family, and committed fraud.  That case remains pending in the chancery court.

¶31.    Boots passed away on January 5, 2013.  As of 2013, Ricky Goforth estimated the total value of the partnership's land and timber to be $2,370,419.  K-1 statements issued after Boots's death show the partnership interests as follows:

| | |
|---|---|
| Walter | 9.01% |
| Walter's wife, Ellen | 8.17% |
| Walter's daughter, Rosemary | 7.22% |
| Walter's son, Walter Jr. | 7.07% |
| Walter's son, Lee | 7.31% |
| **Walter's family - TOTAL** | **38.78%** |
| William | 2.48% |
| William's wife, Mary | 8.17% |
| William's daughter, Amanda | 7.94% |
| William's son, Daniel | 7.59% |
| William's daughter, Caitlin | 7.09% |
| William's son, Wade | 8.17% |
| **William's family - TOTAL** | **41.44%** |
| Frederick | 0.13% |
| Frederick's wife, Barbara | 4.86% |
| Frederick's daughter, Ann | 4.86% |
| Frederick's daughter, Kristin | 4.86% |
| Frederick's daughter, Kimberly | 4.86% |
| **Frederick's family - TOTAL** | **19.57%** |

William's interest was reduced because he had elected to withdraw cash from his partnership account from time to time.  As discussed above, Frederick's wife and children have smaller

14

interests because Boots did not transfer equity to them from 1998 to 2001. The reasons for the minor differences in the other grandchildren's interests are not explained.

¶32.    At the time of her death, Boots also owned two-thirds interests in Gully Place and Whitsett Field. *See supra* n.1. As noted above, Frederick had traded his interest in those properties to Walter and William in exchange for their interest in other family land. Under Boots's will, her interest in Gully Place and Whitsett Field pass to Walter and William in equal shares, which would give each of them a half interest in the properties.

¶33.    Walter filed a complaint to probate Boots's will in the Lauderdale County Chancery Court, and the court admitted the will to probate and issued letters testamentary to Walter as the executor.[5] Frederick filed a complaint to contest the will, alleging that it was the product of Walter's undue influence. Frederick's complaint sought to set aside the will, to remove Walter as executor, and other relief. Frederick also filed a motion to consolidate the will contest with his pending lawsuit related to the partnership; however, the chancery court consolidated the cases for discovery purposes only, and the first case remains pending.

¶34.    The will contest proceeded to a jury trial on April 4-8, 2016, and the jury returned a

---

[5] Walter initially sought to probate the will along with a codicil that Boots signed in 2007. The codicil, which Boots signed on Walter's recommendation, added an in terrorem (or forfeiture) clause to the will. In 2015, the Mississippi Supreme Court held, as a matter of first impression in this State, that such clauses are unenforceable as to any beneficiary who contests a will in good faith and based on probable cause. *See Parker v. Benoist*, 160 So. 3d 198, 203-06 (¶¶9-15) (Miss. 2015). After the *Parker* decision, Walter confessed that the codicil to Boots's will probably was unenforceable, and he filed a motion to withdraw probate of the codicil. At trial, Walter confessed that the codicil was invalid, and the court instructed the jury that it was invalid and had no effect on Boots's will.

unanimous general verdict for Walter and William, as the proponents of the will. The court entered judgment on the verdict, declaring the will valid. Frederick filed a motion for judgment notwithstanding the verdict (JNOV) or a new trial, which the chancellor denied, and a timely notice of appeal.

## ANALYSIS

¶35. Frederick lists ten issues on appeal, but the issues may be combined and restated fairly as just two: First, Frederick argues that on the facts of this case a presumption of undue influence arose as a matter of law. Therefore, Frederick argues that the trial judge should have given a peremptory instruction that the presumption applied and that Walter and William bore the burden of rebutting the presumption by clear and convincing evidence. Second, Frederick argues that he was entitled to JNOV because there is no substantial evidence to support the jury's verdict. We address these arguments in turn.

¶36. We review de novo the trial judge's denial of a peremptory instruction on the presumption of undue influence. *See Martin ex rel. Heirs of Martin v. B & B Concrete Co.*, 71 So. 3d 611, 614 (¶7) (Miss. Ct. App. 2011) ("Our review of a trial court's refusal of peremptory instructions is de novo."). We also review de novo the denial of a motion for JNOV. *See Estate of Gardner v. Gardner*, 228 So. 3d 921, 926 (¶19) (Miss. Ct. App. 2017), *cert. denied*, 223 So. 3d 787 (Miss. 2017). "We consider the evidence in the light most favorable to the non-movant, giving that party the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Id.* (internal quotation mark and alteration omitted). "If the facts so considered point so overwhelmingly in favor of the movant that

16

reasonable jurors could not have arrived at a contrary verdict, then the movant is entitled to JNOV." *Id.* (internal quotation mark and alteration omitted). "However, if there is substantial evidence" to support the verdict—i.e., "evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions"—the motion for JNOV must be denied. *Id.*

¶37. The basic legal principles applicable to will contests and claims of undue influence are well-settled. "The proponent of a contested will bears the burden of proving its validity in all respects." *In re Estate of Pigg*, 877 So. 2d 406, 409 (¶8) (Miss. Ct. App. 2003). "A prima facie case of validity is made when the will and its record of probate are admitted into evidence." *Id.* "The contestants then bear the burden of going forward with evidence to challenge the will's validity." *Id.*

¶38. A will that is the product of undue influence will be declared invalid. *In re Estate of Thorton*, 922 So. 2d 850, 852 (¶7) (Miss. Ct. App. 2006). "A will is said to be the product of undue influence when an adviser has been so importunate as to subdue the testator's will and free agency." *Estate of Pigg*, 877 So. 2d at 411 (¶24). "Such may be accomplished through a variety of methods, such as advice, arguments, or persuasion." *Id.* "However, not all influence exerted is undue. The influence must have been so overwhelming that the resulting instrument reflected the will of the adviser rather than the testator." *Id.* Under the traditional undue influence doctrine, the contestant bears the burden of producing "some evidence" of undue influence. *Id.* at 411 (¶26). But the ultimate burden of persuasion never shifts. The proponent must prove, by a mere preponderance of the evidence, that the will is

valid—i.e., "the product of the [testator's] free will." *Id.* at 412-13 (¶¶32-34).

¶39.    However, if there is a confidential relationship between testator and beneficiary, a presumption of undue influence *may* arise. *See Costello v. Hall*, 506 So. 2d 293, 298 (Miss. 1987).    In a will contest, a confidential relationship alone does not give rise to the presumption.    Rather, "there must also be an *abuse* of that relationship relating to the execution of the will." *Id.*  Thus, "where a confidential relation exists between a testator and a beneficiary under his will, *and the beneficiary has been actively concerned in some way with the preparation or execution of it*, the law raises a presumption that the beneficiary has exercised undue influence over the testator, and casts upon the beneficiary the burden of disproving undue influence by clear and convincing evidence." *Croft v. Alder*, 237 Miss. 713, 722-23, 115 So. 2d 683, 686 (1959) (emphasis added).  The Supreme Court has also stated that the presumption of undue influence arises if the contestant proves "a confidential relationship *and suspicious circumstances in the execution of a* [*w*]*ill*." *Davion v. Williams*, 352 So. 2d 804, 805 (Miss. 1977) (emphasis added).

¶40.    Thus, if the contestant proves *both* (a) a confidential relationship *and* (b) the beneficiary's active involvement in the preparation or execution of the will or other "suspicious circumstances" in the execution of the will, the presumption of undue influence arises. *See* Robert A. Weems, *Wills and Administration of Estates in Mississippi* § 8:18 (3d ed. 2003).  "The burden is then upon the proponent to overcome the presumption by clear and convincing proof of good faith on the part of the beneficiary, [the] testator's full knowledge and deliberation of his or her actions and their consequences, and [the] testator's exhibition

18

of independent consent and action." *Id.* "Factors to be considered in determining whether the beneficiary exhibited good faith are: (1) who sought the preparation of the will; (2) where the will was executed and who was present; (3) the attorney's fee and who paid it; and (4) the secrecy or openness of the execution of the will." *Id.* Factors that may be relevant to the testator's "knowledge and deliberation" include the testator's (1) awareness of her assets and their general value; (2) understanding of her heirs at law and/or under a prior will; (3) understanding of the legal effect of the contested will; (4) knowledge that non-relative beneficiaries would be included or excluded; and (5) dependence on others in the handling of her finances. *In re Last Will & Testament & Estate of Smith*, 722 So. 2d 606, 612 (¶22) (Miss. 1998). "[T]here is no express list of factors regarding the testator's 'independent consent and action.'" Weems, *supra*, § 8:18. Rather, the fact-finder should consider the totality of the relevant circumstances. *Id.* Finally, we note that good faith, knowledge and deliberation, and independent consent and action "are not independent requirements to be rigidly exacted in every case, but rather are indicia of the real question: whether the will was the product of undue influence." *Id.*

¶41.   With these principles in mind, we first address Frederick's contention that the chancellor should have given a peremptory instruction that there was a presumption of undue influence. The chancellor did instruct the jury, as a matter of law, that there was a confidential relationship between Walter and Boots when the will was executed.[6] However,

_____

[6] The relationship was deemed confidential because Walter had acted as Boots's attorney in the past by drafting deeds and other documents for her. In addition, Boots's

19

the chancellor declined to instruct the jury that the presumption of undue influence arose as a matter of law. Rather, the chancellor instructed the jury that the presumption would arise *if* the jury found an abuse of the confidential relationship in the form of Walter's involvement in the preparation or execution of the will or other suspicious circumstances. The court's instruction correctly stated the applicable legal principles, and there was no objection to any of its specific language. Frederick argues only that a peremptory instruction should have been given on this issue. We disagree.

¶42.    In some cases, it will be appropriate for the trial judge to decide this issue as a matter of law and instruct the jury that "the evidence creates a presumption of undue influence." *In re Estate of Vick*, 557 So. 2d 760, 770 (Miss. 1989). However, whether the facts give rise to the presumption "may . . . be a jury question as well." *Id.* "If the facts are in dispute, . . . a two-pronged inquiry" should be submitted to the jury: "has there been sufficient evidence adduced to create the presumption, and if so, has there been sufficient evidence adduced to dissipate it." *Id.*

¶43.    In this case, the facts surrounding the circumstances of the will's preparation and execution were, at the very least, "in dispute." Walter denied that he was "actively concerned in some way with the preparation or execution of [Boots's will]." *Croft*, 237 Miss. at 722-23,

---

power of attorney designated Walter as her attorney in fact. As this Court has observed, the relationship between a parent and an adult child is not always, or even typically, "confidential." "[I]n the absence of evidence to the contrary, the parent is presumably the dominant party. This is true even though the parent is aged, or aged and infirm." *Noblin v. Burgess*, 54 So. 3d 282, 296 (¶52) (Miss. Ct. App. 2010) (quoting *In re Estate of Summerlin v. Summerlin*, 989 So. 2d 466, 477 (¶37) (Miss. Ct. App. 2008)).

115 So. 2d at 686. In addition, the recordings of Boots's meetings with Don Rogers, the testimony of Rogers, and other evidence corroborated Walter's testimony. Walter appropriately told Boots that he could not be involved in the preparation of a new will, and he simply suggested another lawyer in town that she might call on for advice. As recordings of their meetings make clear, Boots contacted Rogers on her own and went to his office alone. Indeed, Boots told Rogers that no one else even knew about their meeting. As a "courtesy," Walter told Rogers that Boots might call him; however, they did not discuss Boots's will, and Walter only later learned that Boots had met with Rogers and made a new will. Without more, Walter's simple act of recommending an attorney is not the sort of active involvement in the preparation of a will that will raise a presumption of influence.[7] At most, this was an issue for the jury—not an issue that could be decided against the proponents *as a matter of law*.

¶44. Nor can we say, *as a matter of law*, that this case involved any other "suspicious circumstances in the execution of [the will]." *Davion*, 352 So. 2d at 805; *see* Weems, *supra*, § 8:18 (noting that the term "suspicious circumstances" is "obviously vague" if applied to conduct other than a beneficiary's "activity in preparing or executing the will"). When Walter received Frederick's letter requesting a buyout of his "future interest" in the partnership, he took the letter to Boots. Walter felt that it was appropriate and necessary to do so because Boots was the partnership's managing general partner. Indeed, Frederick

_____

[7] Stated differently, the law did not require Walter to tell his mother to pick a lawyer out of the phonebook.

21

testified at trial that he expected Walter to give the letter to Boots, and Frederick agreed that it was natural and logical for Walter to have done so. Walter also testified that Boots decided on her own what to do in response to the letter. When Boots said that she would need to change her will, Walter told her that he could not be involved and suggested that she call another attorney. The recordings of Boots's meetings with Don Rogers, Boots's handwritten letter and drafts, and Rogers's testimony all provide corroboration of Boots's reasons for wanting to change her will, her independence, and her deliberation. Frederick was not entitled to a peremptory instruction based on alleged "suspicious circumstances."

¶45. We now address Frederick's further contention that he was entitled to JNOV because there was insufficient evidence to support the jury's verdict. "We consider the evidence in the light most favorable to [Walter and William], giving [them] the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Estate of Gardner*, 228 So. 3d at 926 (¶19) (internal quotation mark and alteration omitted). If there is "substantial evidence" to support the verdict, we will affirm the judgment entered on the verdict. *Id.*

¶46. For the reasons discussed just above, the evidence at trial permitted the jury to find that Walter was not actively involved in the will's preparation or execution; that there were no other suspicious circumstances in the will's execution; and, therefore, that the evidence did not raise a presumption of undue influence. In the absence of such a presumption, Walter and William were required to prove by only a "preponderance of the evidence" that "the will was the product of [their mother's] free will." *Estate of Pigg*, 877 So. 2d at 413 (¶33). Based on the evidence presented at trial, the jury certainly could have so found. As discussed

22

above, there is substantial evidence to support the verdict, including Boots's own statements in her recorded meetings with Don Rogers, her handwritten letter and prior drafts, Walter's testimony, and Don Rogers's testimony.[8]  Because there is substantial evidence to support the jury's general verdict for the proponents, we affirm the chancellor's denial of Frederick's motion for JNOV.  *Estate of Gardner*, 228 So. 3d at 926 (¶19).[9]

## CONCLUSION

¶47.    The chancellor properly instructed the jury on the law of undue influence, and there is substantial evidence to support the jury's general verdict in favor of the proponents of the will, Walter and William.  Therefore, the judgment is **AFFIRMED**.

**LEE, C.J., IRVING, P.J., BARNES, CARLTON, FAIR, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.  GRIFFIS, P.J., NOT PARTICIPATING.**

---

[8] Frederick briefly asserts that the verdict cannot be sustained based solely on the testimony of Walter and Don Rogers because neither was a "disinterested party."  *See, e.g.*, *Pallatin v. Jones (In re Will of Fankboner)*, 638 So. 2d 493, 495 (Miss. 1994).  As noted above, Rogers and Walter both testified they knew one another professionally but were not close or social friends when Rogers drafted the contested will; however, they also acknowledged that Rogers later represented Walter and William in Frederick's first lawsuit against them.  Yet, even if we assume that Rogers was not a "disinterested party," Boots's own recorded and handwritten statements provided compelling evidence of the will's validity.

[9] Even if the jury found that the presumption arose, there was substantial evidence from which the jury could have also found that Walter and William successfully rebutted the presumption by evidence of their own good faith and Boots's full knowledge, deliberation, and independent consent and action.  *See supra* ¶40.  However, it is unnecessary for us to address that issue in detail, as there is substantial evidence to sustain the jury's general verdict on the ground discussed in the text.  *Cf. Estate of Lawler v. Weston*, 451 So. 2d 739, 740 (Miss. 1984) (holding that a general verdict in favor of the contestants will be upheld if there is sufficient evidence to sustain the verdict on either of two possible grounds).

23