ISHEE, J.,
for the Court:
¶ 1. Upon Patricia Langston’s death, her estate challenged certain inter vivos gifts that Patricia had given her husband, Mansfield Langston. The estate claimed the gifts were void as a result of Mansfield’s undue influence. The chancellor found no undue influence and upheld the inter vivos gifts. Patricia’s estate appeals. Finding no error, we affirm.
STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 2. Mansfield and Patricia were married for approximately eleven years before Patricia’s death on May 11, 2005. The couple had no children together, but each had children from prior relationships. They lived in Mansfield’s home in Indiano-la, Mississippi, from the time they married in 1994 until 2002. They owned the home as joint tenants with the right of survivor-ship. On March 1, 2002, Patricia purchased a home on French Road in Indiano-la in her name only. She then quitclaimed Mansfield’s home back to him.
¶ 3. On March 15, 2002, Patricia executed a will leaving her estate equally to her children. The will specifically excluded Mansfield, stating that “[Mansfield] has his own estate in his name, therefore no provision for him is made in this will.” Mansfield executed a similar will, leaving his estate to his children. Mansfield was named executor of Patricia’s will. On May 9, 2002, Patricia executed a warranty deed, conveying the French Road home to herself and Mansfield as joint tenants with the right of survivorship. The home became their marital residence. On June 11, 2002, Patricia executed a second will. It was identical to her first will, except it named Patricia’s mother, Ethel Williams, as executor. On September 4, 2003, Mansfield and Patricia executed a $200,000 certificate of deposit as joint tenants with the right of survivorship.
¶ 4. Upon Patricia’s death in 2005, Williams opened her estate and moved to set aside the joint tenancies in the marital home and the certificate of deposit. Williams argued that the documents were void because Mansfield used undue influence in their execution, and that the home and certificate of deposit should become part of the estate. The chancellor presumed undue influence because of the confidential relationship between Patricia and Mansfield. Because Mansfield failed to overcome this presumption, the joint tenancies were set aside. Mansfield appealed.
¶ 5. This Court reversed. In re Estate of Langston, 57 So.3d 657, 663 (¶ 28) (Miss.Ct.App.2010). We found that the chancellor erroneously presumed undue influence, *31 and we rendered a finding that the joint tenancies were valid. Id. The case was then taken on writ of certiorari by the Mississippi Supreme Court. In re Estate of Langston, 57 So.3d 618 (Miss.2011). The supreme court also reversed the chancellor’s judgment, but remanded the matter for a new trial to allow the estate the opportunity to prove Mansfield exercised undue influence. Id. at 622 (¶ 18). As a matter of first impression, the supreme court held that “[a] confidential relationship between spouses does not create a presumption that one spouse used undue influence over the other to obtain an inter vivos gift.” Id.[1] At the second trial, the chancellor considered the original testimony, and the estate called two new witnesses. Applying the law as stated by the supreme court, the chancellor found no undue influence and upheld the joint tenancies as to Mansfield.
¶ 6. Patricia’s estate appeals, arguing: (1) the chancellor erred in finding no undue influence; and (2) the chancellor failed to consider testimony on the effects of domestic violence. We find no error and affirm.
STANDARD OF REVIEW
¶ 7. The standard of review of chancery matters is limited. In re Estate of Baumgardner, 82 So.3d 592, 598 (¶ 15) (Miss.2012). We will not disturb a chancellor’s factual findings that are supported by substantial evidence. Id. The chancellor’s decision will be affirmed “unless the chancellor abused [her] discretion, was manifestly wrong, or [her] findings were clearly erroneous, or [she] applied an erroneous legal standard.” Id. (quoting Corp. Mgmt. Inc. v. Greene Cnty., 23 So.3d 454, 459 (¶ 11) (Miss.2009)). We review questions of law de novo. Id.
DISCUSSION
I. Undue Influence
¶ 8. Williams argues that Mansfield unduly influenced Patricia to sign the warranty deed and certificate of deposit, and that these gifts should be set aside.
¶ 9. “It is undoubtedly true that a husband or a wife may exercise undue influence upon the other spouse.... ” Langston, 57 So.3d at 620 (¶ 10) (quoting Genna v. Harrington, 254 So.2d 525, 528 (Miss.1971)). However, “[a] confidential relationship between spouses does not create a presumption that one spouse used undue influence over the other to obtain an inter vivos gift.” Id. at 622 (¶ 18). “Rather, it is the contestant’s burden to show that the surviving spouse used undue influence.” Id. at 621 (¶ 11). With regard to both testamentary and inter vivos gifts, undue influence will be found where a spouse has “used undue methods for the purpose of overcoming the free and unrestrained will of the [other spouse,] so as to control [his or her] acts and to prevent [him or her] from being a free agent.” Id. (quoting Genna, 254 So.2d at 529).
¶ 10. Williams first asserts that Patricia’s weak physical and mental state made her susceptible to Mansfield’s undue influence. Patricia suffered from heart disease, leaking heart valves, kidney disease, asthma, high blood pressure, gout, and foot swelling. She was a member of the class-action suit against the maker of the diet drug Fen-Phen. She died at the age of forty-nine. However, Patricia’s physical or mental state alone is not determinative *32 of whether Mansfield used undue influence over her. Rather, Williams must prove that Mansfield used undue methods over Patricia specifically to make her sign the warranty deed and certificate of deposit. The chancellor found that Patricia’s poor health was insufficient to show undue influence. This is consistent with the testimony, which reflected that despite her health issues, Patricia was mentally sharp and capable of making independent decisions. There is no evidence that Mansfield took advantage of Patricia’s poor health to unduly influence her to sign the documents.
¶ 11. Williams next argues that Patricia’s secretiveness is proof of Mansfield’s undue influence. Williams asserts that Patricia usually discussed banking matters with her and Patricia usually banked at Planter’s Bank, where Williams worked. Patricia did not tell Williams about the certificate of deposit, and the issuing bank of the certificate of deposit was Guaranty Bank, the bank Mansfield typically used. Paul Townsend, a Guaranty Bank employee, assisted Patricia and Mansfield in executing the certificate of deposit. Townsend testified that Patricia was clear and lucid on the day she signed the document. She did not appear to be fearful, or under coercion or duress. Instead, Patricia “did most of the talking.... [S]he was asking the right questions. She was asking about interest rates and about penalties for early withdrawals.... She definitely had above average knowledge of banking.”
¶ 12. Regarding the warranty deed, which was prepared by Mansfield’s attorney, Williams argues Patricia was also secretive about this document, and was denied independent advice and counsel. The attorney, Richard Noble, testified that Patricia instructed him to prepare the deed because the French Road home had become the couple’s marital residence. He never spoke to Mansfield about preparing the deed. He testified that Patricia was “a very intelligent person. She understood business[;] she was articulate.” He saw no signs of fear, coercion, or duress. We note that Noble was not solely Mansfield’s attorney, as Noble had prepared Patricia’s will. Williams asserts, however, that this further shows Noble’s bias, as he failed to explain to Patricia that the deed was inconsistent with her will’s provision leaving her property to her children. We find no evidence that Patricia intended for her children to receive the home, nor that the deed is inconsistent with Patricia’s will.
¶ 13. Next, Williams argues Patricia was the victim of domestic abuse, and this affected her mental state. Patricia’s sister, Debra Poole, testified at the second trial about three arguments between Patricia and Mansfield. In 2002, Poole witnessed Mansfield become angry about Patricia’s decision to purchase the French Road home. He stated that if she purchased it, he would not move there with her. Poole stated he appeared “very stern.” The second argument occurred in either in December 2002 or 2003. Mansfield thought Poole and Patricia were at their mother’s house, but they had gone to their grandmother’s house instead. Poole overheard Mansfield tell Patricia “very angrily” on the phone “that we ha[d] not been where we said we were going ....” Mansfield came to the home, “had words” with Patricia, and left. According to Poole, Patricia began “clinching herself and looking at [Poole] ... as if she was afraid of him or afraid of what he may do.” The third argument occurred in 2003, when Mansfield accused Patricia of cheating on him. Poole came to Patricia’s defense, and Poole and Mansfield began to argue. Poole eventually told Mansfield that she was not going to continue arguing with him, and the argument ended. Poole testified that Mansfield’s accusations of in *33 fidelity led Patricia to become withdrawn from family and friends.
¶ 14. Herbert Lee, Patricia’s attorney from the Fen-Phen litigation, testified that Patricia arrived at a meeting with two black eyes, and she appeared fearful of Mansfield. Williams also saw dark circles around Patricia’s eyes during this same time period. Neither knew what caused the marks. Mansfield denied that Patricia had black eyes, and he denied that Patricia was afraid of him. He stated he never hit or abused Patricia; rather, they had a loving, caring relationship. He testified that Lee had a personal grudge against him, which influenced Lee’s testimony. Testimony was presented from Patricia’s friends that she had stopped visiting them, or did so infrequently. Also, a family friend testified that Mansfield had accused him of having an affair with Patricia.
¶ 15. None of the testimony provided by the estate proved that Mansfield unduly influenced Patricia to sign the warranty deed and certificate of deposit. To succeed on her claim, Williams was required to prove that Mansfield used undue methods to overcome Patricia’s “free and unrestrained will,” and that Mansfield controlled her and prevented her from being a free agent. Langston, 57 So.3d at 621 (¶ 11). The testimony showed the opposite. Patricia bought the French Road home without Mansfield’s approval, showing that Patricia was capable of making independent decisions. The bank employees testified that Patricia was intelligent and understood the documents she signed. She asked relevant questions about the certificate of deposit, and the deed was prepared solely at her instruction. Both bank employees testified that Patricia did not appear to be under the influence of threats, coercion, or duress when she signed the documents.
¶ 16. As to Williams’s arguments that Patricia did not tell her about the documents, did not receive consideration, and used Mansfield’s attorney as her own without independent counsel, this is typical behavior of a married couple. Patricia and Mansfield had been married for eight years when the documents were executed. A close, confidential relationship was to be expected. See In re Estate of Chapman, 966 So.2d 1262, 1264 (¶ 16) (Miss.Ct.App.2007). “[T]he mere fact that there is a close relationship between parties in a marriage does not mean that one’s influence upon another is undue influence.” Id. at (¶ 14) (quoting Genna, 254 So.2d at 528).
¶ 17. The chancellor did not err in finding that Williams failed to prove undue influence. The chancellor’s decision was based on substantial evidence, and was not an abuse of discretion, manifestly wrong, or clearly erroneous. This issue is without merit.
II. Relevancy of Domestic-Abuse Testimony
¶ 18. Martha Kiihnl testified at the second trial as a lay witness on the effects of domestic violence. Specifically, she testified that in domestic-violence situations, the abuser seeks to coerce and intimidate the victim, and has no regard for the victim’s rights, feelings, or well-being. She testified that domestic abuse may result in isolation from family and friends or affect the decision-making ability of the abused spouse. Further, she stated that education and intelligence are irrelevant when abuse is involved. The chancellor found her testimony unhelpful, as she only “described the general symptoms found in women living in battered marriages.” Ki-ihnl had never met Patricia or Mansfield, and she did not examine any documents related to the case.
*34 ¶ 19. Williams argues the testimony was proper under Mississippi Rule of Evidence 701, as it was “helpful to the clear understanding of the testimony or the determination of a fact issue.” However, the first requirement of Rule 701 is that the testimony is “rationally based on the perception of the witness.” “Lay witnesses are only permitted to testify as to a layman’s opinion based upon facts first detailed to the jury.” Genna, 254 So.2d at 529. Kiihnl had no knowledge of the facts of this ease.
¶ 20. The chancellor did not abuse her discretion in finding Kiihnl’s testimony irrelevant. This issue is without merit. The chancellor’s decision finding the joint tenancies valid is affirmed.
¶ 21. THE JUDGMENT OF THE SUNFLOWER COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ROBERTS, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., NOT PARTICIPATING.

. This holding extended the rule in Genna v. Harrington, 254 So.2d 525, 528 (Miss.1971), which had previously held "that the confidential relationship between husband and wife does not raise a presumption of undue influence” with regard to testamentary gifts. Langston, 57 So.3d at 620 (¶ 10).