# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01725-COA

**BRUCE EVANS COBB AND RONALD ZACHARY COBB**       **APPELLANTS**

**v.**

**DAPHNE COBB**       **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/24/2018 |
| TRIAL JUDGE: | HON. JAMES B. PERSONS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANTS: | JIM L. DAVIS III |
| ATTORNEY FOR APPELLEE: | TIMOTHY LEE MURR |
| NATURE OF THE CASE: | WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 04/28/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., TINDELL AND McDONALD, JJ.

### McDONALD, J., FOR THE COURT:

¶1. This is an appeal from a judgment of the Chancery Court of Harrison County concerning the distribution of the investment-account proceeds of Robert Cobb, deceased, among his sons, Bruce and Zach Cobb, and his wife, Daphne Cobb. Bruce and Zach had been the sole beneficiaries, but four days before his death, Robert signed a new beneficiary form, adding Daphne. The chancery court found that Bruce and Zach had failed to prove by clear and convincing evidence that at the time that Robert signed the change-of-beneficiary form, he did so because of Daphne's undue influence or that Robert lacked mental capacity to make the change. From this judgment, Bruce and Zach appeal. Finding no error, we

affirm the judgment of the chancery court.

**Facts and Procedural History**

¶2.     Robert and Daphne were married on July 25, 2011. Robert was sixty-two years old and had been previously married. They both worked at Memorial Hospital in Gulfport; he worked as a director of hospitality, food nutrition, housekeeping, and security, supervising over 300 employees, and Daphne worked as a nurse. They met in 2000 and began dating in 2004. By 2009, Daphne was living with Robert most of the time, though she never sold her own home. Despite Robert's frequent proposals, Daphne felt there was no rush to be married. Even family members agreed that Robert loved Daphne very much.

¶3.     In early 2011, things changed. Daphne was diagnosed with skin cancer that had traveled through her nervous system to her facial bones. She underwent several surgeries and radiation treatments. Shortly thereafter, in June 2011, Robert was diagnosed with cancer of the small bowel that had spread to his lungs and pancreas. At this point, they decided to marry. They had no prenuptial agreement, and they added each other to their bank accounts and life insurance policies.

¶4.     Robert had two sons from his previous marriage: Bruce and Zach. His relationship with Zach was good, but it was "up and down with Bruce."[1]

¶5.     After his cancer diagnosis, Robert took medical leave. But on January 10, 2012, he decided to retire and contacted Cathy Wood, the vice president of human resources at the hospital, to begin the process. He requested the lump-sum payment retirement option. Wood

---

[1] Robert and Bruce had some disagreements about Bruce's use of Robert's credit card and medication.

2

spoke to Robert again on January 20, 2012, updating him on the processing of the paperwork that would be given to Daphne to bring to him. At the time of his death, Robert owned four investment accounts with The Variable Annuity Life Insurance Company (VALIC) valued at $472,034.34. Bruce and Zach were originally the named beneficiaries to share equally in the investment accounts.[2]

¶6.     Wood emailed Brian Milner, the VALIC representative, about Robert's plans. Milner prepared the necessary paperwork that Robert would need to sign. Daphne was told by human resources personnel to go by Milner's office to pick up the paperwork for Robert to sign, which she did on February 6, 2012. According to her, when she arrived, Milner had the paperwork ready, except for whom was to be listed as beneficiaries. Daphne called Robert and gave the phone to Milner. Milner spoke to Robert and wrote in Daphne, Bruce, and Zach as the beneficiaries. There were tabs put on the paperwork where Robert needed to sign. According to Daphne, Milner said he was going out of town in a day or two, so she wanted to get the paperwork back to him before that time. There are inconsistencies within the paperwork Milner prepared concerning the amounts in the accounts, but there was no testimony that Daphne was responsible for them.

¶7.     Milner did not remember the specifics as did Daphne. But he confirmed that he wrote in the names of the beneficiaries after he had spoken to Robert. Milner knew Robert had initiated these changes because Milner would not accept anyone else talking to him about

---

[2] Robert also had a life insurance policy that had named them as beneficiaries. After his marriage to Daphne, he added her as a beneficiary as well. Both sons were aware of this addition.

such a matter. There was no evidence that Daphne had initiated or suggested the change of beneficiaries.

¶8.    On his last visit to M.D. Anderson Hospital on January 25, 2012, Robert was noted to be very fatigued but "awake, alert, and oriented x 3." At this time, Robert was wearing a fentanyl patch and took multiple doses of Dilaudid for pain. At Robert's medical examination on January 30, 2012, to determine permanent disability, Dr. Purushottam V. Pande noted that he explained a possible therapy that could be prescribed, but Robert said he was not interested in it. Dr. Pande recorded that Robert's prognosis was extremely poor "and it is well understood by him [(Robert)]." No medical testimony was provided on the issue of Robert's mental capacity as of February 7, 2012.

¶9.    Although visibly physically ill, Robert still visited Memorial Hospital on February 1, 2012, to see the newly remodeled kitchen and dining room that he had helped design. His sons, Bruce and Zach, and his wife, Daphne, were with him. His friend Larry Henderson, vice president of administrative services at the hospital, arranged the visit. Larry was Robert's supervisor, and they had worked together for twenty-two years. They were close personal friends as well. Larry testified that Robert was an avid Alabama football fan and that they traveled to Tuscaloosa in November 2011 to attend a game. Regarding that tour of the hospital's kitchen, Larry described Robert during direct examination:

> Q.    Could you tell me a little bit about Robert and that day, whatever day, January or February, and what you observed about him that day?
>
> A.    Robert was obviously very sick. He was weak, but he was able to tour. We toured for probably, I don't know, 25 or 30 minutes, walked through the kitchen. And he would ask questions about what do we do

4

about this, and what do we do about that, and why did you change that when I didn't want it changed. And then at the end, we were standing kind of in a hallway, and he just said, it looks good.

Henderson said Robert understood everything and asked appropriate questions. He was still "the same Robert" he had known.

¶10. On February 7, 2012, Larry Henderson, his wife Diane, and Cathy Wood visited Robert at home to present him a plaque and give him his retirement package. Concerning Robert's condition at that time, Larry's testimony follows:

Q. Tell me a little bit about -- Mr. Henderson, tell me a little bit about Robert's involvement in the conversation.

A. We had a conversation like we had had for the last 22 years. I asked Robert questions. Robert asked me questions. Diane asked Robert questions. We just talked like we had always talked.

Q. Were you talking like the two of us are talking now?

A. Yes, sir.

Q. Did anyone have to cover for Robert or help him in the conversation?

A. No, sir.

Q. What did you observe in this conversation on February the 7th, 2012, about Robert's ability to speak?

A. Robert spoke. He spoke slower than he used to, but he spoke clearly and distinctly. He carried on a conversation with us.

Q. Other than speaking slower, was there anything different about the way Robert spoke on February the 7th than he did in years earlier at the hospital?

A. No.

¶11. All three co-workers testified that they met with Robert for thirty to forty minutes and

that during that time he was mentally "the same old Robert," remembering past events, speaking clearly, and even discussing hospital gossip. Robert did not drift off to sleep or "glaze over in the conversation." Cathy Wood, who had known Robert since 1982, had the following exchange:

Q.   And what did the -- what did you specifically talk about with Robert? What was the subject of your conversations?

A.   You know, we -- I can't remember real specifics, but, you know, we talked about old times. We talked about things that we had done. We, of course, reminisced about some of the things we did during the storm, how we reacted. We -- I remember being surprised that Robert was up on hospital gossip and mentioned things that I didn't know was going on.

¶12.   On February 8, 2012, Robert signed the change-of-beneficiary form. Family members dispute how the papers came to be signed. Robert's sister, Donna Russell, who was close to her brother, was in the kitchen that morning. She said that Bruce took Robert outside to the garage, where they had put some chairs because Robert would go there to smoke. Donna said that Daphne had an envelope and was walking around inside, fidgeting. When Bruce came in for a moment, Daphne went outside. Donna was suspicious and told Bruce to go outside and see what was going on. He did, but Donna never followed-up to find out. Donna said she was not concerned when she learned he had signed papers because Robert had told her that he was retiring, and she thought it was his retirement paperwork. Bruce said he was present when his father was signing papers, but Bruce did not know specifically what the papers were. Bruce said Daphne stood behind Robert and indicated where he needed to sign. Neither Bruce nor Donna asked Daphne what Robert had signed, despite Bruce's later

6

contention that Robert was not competent to sign at the time.

¶13.    According to Daphne, on February 7, Robert said he did not feel up to signing the paperwork.  Then next day, he said he was feeling better, and they went into the garage where he could smoke.  Daphne said she asked Donna to come, but Donna declined.  Bruce asked to come and Daphne readily agreed.  In the garage, Bruce sat in one chair and Daphne in another, while Robert went through the papers and signed.  If Robert had a question, Daphne would sometimes get up to look over what he wanted and answered his question.  She said that she told Bruce that he was a witness to this, and she asked if he had any questions.  Bruce did not.  But Daphne did say that when she got to the change-of-beneficiaries portion, Daphne just said, "[H]ere is the change.  Is that what you want?"  Robert replied, "Yes."  But she did not call out the names of the beneficiaries.

¶14.    Daphne's daughter, Erin Bailey, testified that she had known Robert since he started dating her mother in 2003 or 2004.  She said she and her children would visit her mother and Robert on weekends and two or three times during the week.  During the last two weeks of his life, Bailey testified that Robert's speech was clear and not slurred and that he would not glaze over in a conversation or fall asleep.  Bailey also testified that she was present at the home on the day Robert signed the papers, and she verified her mother's testimony that Daphne asked Donna to come into the garage when Robert signed the papers.  Donna declined to do so.

¶15.    The parties agree that the signatures and initials on the forms are Robert's and are not forgeries.

¶16.   Within an hour of signing the papers, Robert was visited by Rev. Victor Chatham, a retired hospital chaplain and personal friend.  Chatham testified that he first met Robert in 1989 at Memorial Hospital where Chatham eventually became chaplain.  They developed a friendship through different circumstances, which continued after Chatham retired in 2007.  Chatham considered himself Robert's friend at times and as his chaplain at others.  When Robert was diagnosed with cancer in 2011, Robert called and met with Chatham at that time.  On February 8, 2012, when Chatham arrived, Robert addressed him by the name "Victor."  The two met in the garage where Robert smoked two cigarettes.  At first, Bruce was with them, but then Robert asked Bruce to leave.  Chatham was asked a series of questions about Robert's abilities to communicate:

> Q.   All right.  And in this conversation when the two of you are in the garage, who did most of the talking?
>
> A.   Robert.
>
> Q.   Could you describe to the Court what you observed about his speech -- the manner of his speaking?
>
> A.   He spoke the way Robert always spoke.
>
> Q.   Which is how?
>
> A.   Clearly and to the point.
>
> Q.   Were his words slurred or unable to understand?
>
> A.   No.
>
> Q.   Did you have any trouble understanding what he was trying to tell you?
>
> A.   No.

Q. Did Robert participate in the conversation the two of you had?

A. Yes.

Q. And did he respond in an appropriate manner?

A. Yes.

. . . .

Q. No difference mentally?

A. Nothing.

. . . .

Q. What is the basis of your opinion of what you just said? Why do you say that?

A. Well, first of all, after the time that we spent together that's privileged, there was a time afterwards that we went into the living room, and the people from Riemann's Funeral Home were there talking about arrangements. And I had said to Robert that I really had a hard time with Ms. Young's funeral and -- since I knew her so well, and that I might have difficulty with his. And he looked at me, and he said, don't worry, Victor, you won't even have to see me. I'll be in that box right there, and you wouldn't have to see me.

¶17. Like other co-workers, Chatham found Robert mentally to be "the same old Robert." As Chatham noted, Robert also met with funeral home representatives to discuss his funeral arrangements. Daphne, Donna, Bruce, and Zach were also present. Bruce testified that Robert was able to hold a limited conversation about the music that was chosen, et cetera. But becoming emotional, Bruce had to leave before the visit ended.

¶18. Unfortunately, Robert's health declined rapidly after this visit. Chatham testified that on his February 11 visit, Robert was essentially comatose. Robert died the following day,

9

on February 12, 2012.

¶19.    Bruce and Zach filed suit against Daphne in the Harrison County Chancery Court alleging that the beneficiary change was null and void due to Daphne's exertion of undue influence on Robert.  Daphne stipulated that she and Robert had a confidential relationship, but after hearing testimony from multiple witnesses, on October 24, 2018, the chancery court ruled that Bruce and Zach had not shown by clear and convincing evidence that the beneficiary change was the result of improper undue influence by Daphne or that Robert lacked the requisite mental capacity to execute the forms.  Bruce and Zach moved for a new trial, which the chancery court denied on December 12, 2018.

¶20.    From the chancery court judgment, Bruce and Zach timely appeal, raising two issues: (1) whether, given the admitted existence of a confidential relationship and proof of suspicious circumstances, the court should have placed the burden of proof on Daphne to show by clear and convincing evidence that the beneficiary change was not the result of her undue influence, and (2) whether the chancery court erred in admitting testimony from the deceased's spiritual advisor, Chatham.

## Standard of Review

¶21.    "A chancellor's findings of fact will not be disturbed unless they are manifestly wrong or clearly erroneous, or unless the chancellor applied an erroneous legal standard." *Stover v. Davis*, 268 So. 3d 559, 563 (¶10) (Miss. 2019).  We review questions of law de novo. *Kaye v. Kaye*, 270 So. 3d 1023, 1025 (¶8) (Miss. Ct. App. 2018).

## Discussion

¶22. Despite the admitted confidential relationship between Daphne and Robert, we agree with the chancery court that the burden of proof was on Bruce and Zach to present sufficient proof that Daphne misused that confidential relationship to influence Robert to change the beneficiaries of his investment accounts. We find no abuse of the chancery court's discretion in finding that Bruce and Zach failed to present such proof. Moreover, Chatham's testimony concerning Robert's mental abilities to speak and interact on the day Robert executed the change of beneficiaries was not precluded by the priest-penitent exclusion in Mississippi Rule of Evidence 505. Accordingly we affirm the judgment of the chancery court.

## I. The court correctly placed the burden of proving undue influence on Bruce and Zach.

¶23. An instrument "is said to be the product of undue influence when an adviser has been so importunate as to subdue [another's] will and free agency." *In re Estate of Rogers*, 270 So. 3d 1, 12 (¶38) (Miss. Ct. App. 2018). "The influence must have been so overwhelming that the resulting instrument reflected the will of the adviser rather than the [other person]." *Id.* This can be done through a variety of methods, such as advice, arguments, or persuasion. *Id.* It is well established that the mere fact that the parties were married does not, by itself, prove or even raise the presumption of undue influence:

> It is undoubtedly true that a husband or a wife may exercise undue influence upon the other spouse. However, a confidential relationship between spouses does not create a presumption that one spouse used undue influence over the other to obtain an inter vivos gift. Rather, it is the contestant's burden to show that the surviving spouse used undue influence. With regard to both testamentary and inter vivos gifts, undue influence will be found where a spouse has used undue methods for the purpose of overcoming the free and unrestrained will of the other spouse, so as to control his or her acts and to prevent him or her from being a free agent.

11

*Estate of Langston v. Langston*, 141 So. 3d 28, 31 (¶9) (Miss. Ct. App. 2014) (citations and quotation marks omitted). In that case, Patricia and Mansfield Langston were married for approximately eleven years prior to Patricia's death in 2005. *Id*. at 30 (¶2). Three years prior, Patricia executed a warranty deed, conveying the home to herself and Mansfield as joint tenants with rights of survivorship. *Id*. at (¶3). A year later, in 2003, Patricia and Mansfield executed a $200,000 certificate of deposit as joint tenants with rights of survivorship. *Id*. Upon her death, Patricia's mother, Ethel Williams, became the executrix of her estate and sought to set aside these joint tenancies, claiming undue influence by Mansfield. *Id*. at (¶4). Williams argued that Patricia's weak physical and mental state made her susceptible to Mansfield's influence. *Id*. at 31 (¶10). But the proof showed that, despite her health issues, Patricia was mentally sharp and capable of making independent decisions. *Id*. Williams then argued that Patricia's secretiveness was proof of undue influence, saying that Patricia normally discussed banking matters with her and the bank issuing the certificate of deposit was Mansfield's, not Patricia's normal bank. *Id*. at 32 (¶11). But the bank employee who assisted them testified that Patricia was clear and lucid and did not appear to be fearful. *Id.* The attorney who prepared the warranty deed testified and said that Patricia had initiated the change and was intelligent, articulate, and understanding in business. *Id.* at (¶12). Even in light of testimony that Patricia may have been a victim of domestic abuse, no connection was made between this and the execution of the joint tenancies. *Id*. at 33 (¶15). Given this proof, we affirmed the chancery court's ruling that Williams had failed to prove undue influence. *Id*. at (¶17).

¶24.    In *Genna v. Herrington*, 254 So. 2d 525, 528 (Miss. 1971), the supreme court held that "it is undoubtedly true that a husband or a wife may exercise undue influence upon the other spouse, but the mere fact that there is a close relationship between the parties in a marriage does not mean that one's influence upon another is undue influence."  Just because a loyal, loving wife obtains the love and trust of her husband, that is no basis to set aside his will in her favor.  *Id*. 528-29.[3]

¶25.    It is clear that in this case the chancery court was correct in not shifting the burden of proof to Daphne.  First, there was no evidence that Robert had been medically diagnosed with any mental deterioration.  His last two medical records show that he was alert and oriented and capable of understanding what the medical doctors told him.  No medical doctor testified to the contrary.  Moreover, from the observations of disinterested parties, Larry Henderson, Cathy Wood, and Victor Chatham, on February 7 and 8, his mind was as sharp as usual.  He understood and participated in conversations.  Second, the testimony is clear that Robert initiated the changes in his beneficiaries, not Daphne.  He called Cathy Wood on January 10, 2011, to discuss his retirement; Milner testified that he would not have changed the beneficiaries without speaking directly to Robert and getting authorization.  That Daphne "participated" in having the papers executed does not present any proof of participation in

---

[3] Bruce and Zach cite *Stover v. Davis*, 268 So. 3d 559 (Miss. 2019), contending that under *Stover* there were suspicious circumstances that warranted a shifting of the burden of proof.  *Id.* at 551 (¶2).  It is noted that it would have been impossible for the chancery court here to have dealt with a case that had not yet been decided.  Importantly, however, *Stover* would not change the outcome.  *Stover* did not disturb the holdings of *Genna v. Herrington* and *Estate of Langston v. Langston* that there is no presumption of undue influence as to spousal gifts or bequests.  The law has always required proof of undue influence with or without the benefit of a presumption.

13

suggesting that the beneficiaries be changed. Moreover, the papers were not signed by Robert in secrecy; Bruce was present and failed to be concerned about his father's capacity to sign the papers or care to know what was in them. Thus, there is no factual basis to support a finding of suspicious circumstances that would have required a shifting of the burden of proof in this case. Sufficient evidence supported the chancery court's conclusion that Bruce and Zach had failed to prove Daphne's undue influence.

¶26. Bruce and Zach repeatedly argue that Robert and Daphne's "short term marriage" constitutes some proof of undue influence. However, even though the marriage was short, the relationship between Robert and Daphne dates back to 2004 when they started dating. Every family member who testified said that Robert loved Daphne and that she loved him. She admitted that they had the "confidential relationship" that husbands and wives should have. But "a confidential relationship between spouses does not create a presumption that one spouse used undue influence over the other. . . ." *Estate of Langston*, 141 So. 3d at 30 (¶9). "[I]t must be shown that the devisee spouse used undue methods for the purpose of overcoming the free and unrestrained will of the testator so as to control his acts and to prevent him from being a free agent." *Estate of Langston v. Williams*, 57 So. 3d 618, 621 (¶10) (Miss. 2011). All witnesses—family and friends—testified that Robert was a strong-willed, determined individual who was not easily swayed when he made up his mind. There was no testimony of any instances where Daphne had forced or manipulated Robert to do something he did not want to do.

¶27. The chancery court here considered the testimony regarding physical evidence and of

14

several disinterested witnesses—a practice we approved in *Kaye*, 270 So. 3d at 1026 (¶11). It was amply proven from independent, un-biased witnesses that Robert was mentally sound, although physically weak, on the day he signed the paperwork changing the beneficiaries. There was no clear and convincing evidence that Robert's decision was due to undue influence exerted by Daphne.

¶28. Accordingly, we find no manifest error by the chancery court in its findings of fact or errors in its conclusions of law concerning who bore the burden of proof and whether that burden was met.

## II. Chatham's testimony was admissible.

¶29. Bruce and Zach claim that the chancery court erred in allowing Chatham to testify. We disagree. Private and confidential communications with clergy may be excluded as evidence by a person with standing to raise such a privilege. M.R.E. 505. Here, Bruce and Zach did not have standing to raise the privilege. M.R.E. 505(c). Moreover, Chatham did not testify to his "communications with Robert," but rather about Chatham's observations of Robert during Chatham's interaction with Robert. *See* M.R.E. 505(a)(2), (b). Moreover, Mississippi Rule of Evidence 505 does not apply unless a communication is made "to a clergyman in his professional character as spiritual advisor." *Roman Catholic Diocese of Jackson v. Morrison*, 905 So. 2d 1213, 1245 (¶116) (Miss. 2005) (quoting M.R.E. 505(b)).

¶30. In this case, Chatham did not testify to "communications" with Robert; Chatham merely described his observations of Robert's speech and abilities during their visits. Moreover, this contest to the beneficiary change was brought by Bruce and Zach

individual—not on behalf of Robert's estate or as Robert's personal representative. Therefore, neither son has standing to object to any of Chatham's testimony, even communications with Robert. Accordingly, Chatham's testimony was admissible.

## Conclusion

¶31. Because the chancery court properly placed the burden of proof on Bruce and Zach to set aside Robert's change of beneficiaries, which they failed to meet, we find no error by the chancery court. Moreover, Chatham's testimony was not barred by Rule 505. Accordingly, we affirm.

¶32. **AFFIRMED.**

**CARLTON, P.J., GREENLEE, WESTBROOKS, TINDELL, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. BARNES, C.J., AND J. WILSON, P.J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**